WALTER M. McDOWELL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McDowell v. Commissioner
Docket No. 18744-81.
United States Tax Court
T.C. Memo 1987-186; 1987 Tax Ct. Memo LEXIS 182; 53 T.C.M. (CCH) 536; T.C.M. (RIA) 87186; April 7, 1987. William Carol Baskett and Alan M. Frieden, for the petitioner. William *183 L. Ringuette, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: By a statutory notice of deficiency dated April 15, 1981, respondent determined deficiencies in and additions to petitioner's Federal income tax as follows: Year
Deficiency
Sec. 6653(b) [1] Addition
1972
$19,402.70
$9,701.35
1973
20,281.03
10,140.52
1974
16,250.77
8,125.38
1975
41,201.57
20,600.79
By a separate statutory notice of deficiency, also dated April 15, 1981, respondent determined a deficiency in the amount of $1,573 in petitioner's Federal income tax for taxable year 1977. After concessions, [2] the issues remaining for decision are: (1) Whether petitioner had unreported income from the operation of his tour boat business in the amounts of $44,363.10, $42,612.35, $37,152.67, and $72,439.54 for taxable years 1972, 1973, 1974, and 1975, respectively; (2) Whether petitioner had *184 unreported interest income from separate transactions with his son and brother in the amounts of $244.20, $244.20, $905, and $1,780.20 for taxable years 1972, 1973, 1974, and 1975, respectively; (3) Whether petitioner had unreported income from "dock rental fees" in the amounts of $195, $975, $1,014, and $4,171.30 [3] for taxable years 1972, 1973, 1974, and 1975, respectively; (4) Whether petitioner had unreported dividend income in the amounts of at least $209, $289.28, and $499.58 for taxable years 1972, 1973, and 1975, respectively; (5) Whether petitioner had unreported income in the form of "reimbursed business expenses" in the amounts of $188.33 and $280.01 during taxable years 1973 and 1974, respectively; (6) Whether petitioner had deductible travel expenses and other ordinary and necessary business expenses for taxable year 1972 in excess of the amount allowed by respondent for such year; (7) Whether petitioner is liable for the section 6653(b) fraud addition for taxable years 1972, 1973, 1974, and 1975; (8) Whether the statute of limitations bars assessment and collection of any deficiency found to exist with respect to taxable years 1972, 1973, 1974, and 1975; and
*185 (9) Whether petitioner is eligible for income averaging pursuant to section 1301 et seq. for taxable year 1977. *186 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, second supplemental stipulation of facts, and exhibits attached thereto are incorporated herein by this reference. Background Facts
Petitioner, Walter M. McDowell, resided in Portsmouth, Virginia, at the time the petition in this case was filed. Petitioner timely filed his Federal income tax returns (Forms 1040) as an unmarried head of household for taxable years 1972, 1973, 1974, 1975, and 1977 with the Internal Revenue Service Center in Memphis, Tennessee. Petitioner timely filed amended U.S. Individual Income Tax Returns (Forms 1040X) for taxable years 1972 and 1974 with the Memphis, Tennessee Service Center in order to claim an investment tax credit in each year. Petitioner personally prepared his original income tax returns that were filed for taxable years 1972, 1973, and 1974. Petitioner's original income tax return for taxable year 1975 and his amended income tax returns for taxable years 1972 and 1974 were prepared by Herbert A. Levin, a certified public accountant practicing in Portsmouth, Virginia. The Tour Boat Business
*187 During all of the taxable years in issue [4] petitioner owned and operated as a sole proprietorship a business known as "Harbor Tours," offering both public and private sightseeing tours of the harbor of Hampton Roads aboard petitioner's tour boat, the "Carrie B." Petitioner's business season lasted from approximately mid-April until approximately the end of September during each of the years in question. Petitioner from time to time employed various persons in the tour boat business on both a full and part-time basis. These persons included petitioner's son, Walter M. McDowell, Jr., his two then teenage daughters, Gayle and Linda McDowell, Stephen R. Jordan, and Dorothy Furbee. [5] A captain, duly licensed by the U.S. Coast Guard, was required to be aboard the tour boat at all times when she was under way. During the taxable years 1972 and 1973, petitioner was the only captain of the tour boat. Walter M. McDowell, Jr. obtained his captain's license and worked as one of the captains during all of the 1974 tour season and through August of the 1975 tour season. During taxable years 1973, 1974, and 1975, Stephen R. Jordan (Jordan) worked as a "mate" on the tour boat, obtaining his *188 captain's license for the 1975 tour season. Gayle and Linda McDowell worked at the snack bar aboard the "Carrie B" and also served as deckhands. Petitioner started in the harbor tour business in 1959, the first such business operating in the Hampton Roads area. The original boat petitioner used could accommodate only a small number of passengers per trip. As the business grew over the years, petitioner changed boats several times in order to accommodate more passengers per trip. The tour boat used by petitioner during the taxable years in issue, the "Carrie B," was qualified and/or licensed for the carriage of 150 persons during taxable years 1972, 1973, and 1974. In January of 1975, the "Carrie B" *189 was outfitted by petitioner and approved by the U.S. Coast Guard for the carriage of 178 persons (including passengers and crew) on protected waters under reasonable conditions. Petitioner offered several different types of tours each season during the years in issue. Not all of these different types of tours were offered throughout the course of an entire tour season, nor was the admission price or policy the same for all types of tours. A brief description of the various types of tours is necessary to a proper resolution of some of the issues raised in this case. Petitioner offered a "school tour" which was essentially a guided tour of the harbor for student groups. School tours embarked from the ports of either Norfolk or Portsmouth. School tours were offered from the beginning of the tour season each year but did not last the entire season, usually ending when school recessed for the summer. A single school tour could and often did consist of groups from several different schools. A school tour generally required that an advance reservation be made, but petitioner did not ordinarily require a monetary deposit to be posted by school groups. [6] Petitioner estimated at trial *190 that the general fare was one dollar per child, but indicated that the rate charged could vary from school to school. The teacher(s) accompanying the school group received free passage, as did those school children who could not pay the fare. Members of the general public were occasionally allowed to go on a school tour. A fare was not always charged to the member of the public in such instances, but such fares as were charged ranged from $ .50 to $1.50, there being no set fare for general admission in the case of a school tour. A "public tour" was a daytime tour of the harbor occurring at regularly scheduled times and open to walk-on passengers from the general public. [7] A public tour lasted approximately 1-1/2 hours, and passengers could board from either *191 the port of Norfolk or Portsmouth. Public tours were not offered throughout the course of the entire tour season, and usually did not begin until after the weather had gotten warmer. The exact number of public tours offered on a particular day varied over the course of the tour season, ranging from one tour per day during the earlier portion thereof, increasing during the height of the tour season to three or four public tours per day, then once again shifting back to only one scheduled public tour per day. Bold print on advertising brochures used in the tour boat business indicated that the scheduled public tours were taken "rain or shine." At trial petitioner acknowledged this was true if enough passengers were present, but indicated that scheduled public tours were sometimes cancelled due to bad weather if there were insufficient passengers. Petitioner could offer no estimate of the number of such cancellations, and the Court concludes there were very few such cancellations. Fares charged for admission on a public tour during the years in issue ranged from $2.00 to $2.50 for adults; $1.00 for children under age six. Passengers on a public tour paid as they boarded the tour *192 boat, generally in cash, but petitioner also accepted traveler's checks and personal checks. A "sunset cruise" was a different type of public tour but also represented a regularly scheduled tour open to walk-on passengers from the general public. Passengers on a sunset cruise could board the tour boat from either the port of Norfolk or Portsmouth. The tour boat advertising brochures indicated during the years in issue that the sunset cruise was offered once per day from June 11 through Labor Day. The admission fee charged for the sunset cruise was $3.00 for both adults and children. As with a daytime public tour, passengers on a sunset cruise paid as they boarded the tour boat, usually in cash. Petitioner also offered various "social cruises" or "charters" (hereinafter referred to as social cruises) which were private group tours of the harbor, not open to members of the general public unless invited by the particular group. More than one group could not go on the same cruise unless the different groups arranged the cruise jointly. Social cruises were offered both *193 during the daytime and at night. A "moonlight excursion" was a type of social cruise offered, deriving its name from the fact that it was offered at night, after completion of the sunset cruise. During the 1972 tour season, the following rates were applicable to the various social cruises or charters: [8]
Sunday through Saturday
Daytime Guided Tours (one and one-
half hours) $2.00 per person, $100.00
minimum.
Sunday through Thursday
Daytime Cruises and Moonlight
Excursions (three hours) $2.50 per
person, $190.00 minimum.
Friday and Saturday
Moonlight Excursions, $3.00 per
person, $225.00 minimum.
Additional Rates
$75.00 per hour for any period over
three hours.
$40.00 additional from midnight to
1:00 a.m.
$100.00 additional per hour after
1:00 a.m.
July and August
10 p.m. til 1 a.m. Friday and Saturday
Rate
An advance reservation was required to schedule a social cruise. A nonrefundable $50 deposit was normally required unless petitioner had dealt with the particular group before. *194 During some of the years in issue, and particularly during 1972, Dolly Haddock (Haddock) was employed by petitioner to answer the phone and make the reservations for school tours and social cruises. Although Haddock appears to have been primarily responsible for this task, she did not in fact handle all the reservations, and any of the other persons employed by petitioner who happened to answer the phone could make reservations for a school tour or social cruise. When a reservation was booked, Haddock filled out a preprinted form, listing the name of the group, date and time of the tour or cruise, estimated number of passengers, and the port where they wished to board. After the reservation sheet was completed, a copy was given to petitioner or other employees of the tour boat business prior to the scheduled date of the tour. A letter confirming the reservation, detailing the terms and conditions of the cruise, and requesting the $50 deposit (if required) was then sent to the particular customer. After the school tour or social cruise was over, petitioner's copy of the reservation sheet pertaining thereto was thrown away, petitioner indicating at trial that he saw no reason to *195 retain it any longer. Some of the groups which had reserved a tour or cruise failed to show up, and petitioner also threw away the reservation sheets pertaining thereto. Petitioner kept no records to indicate either the total number of reservations made or the number of tours or cruises which cancelled or failed to show up for any of the taxable years in issue. [9]
The tour boat business generated gross receipts from two sources: passenger fares and sales from the snack bar petitioner operated on his boat. Snacks such as soft drinks, sandwiches, potato chips, etc., souvenirs such as pennants and sea shells and film were generally available for purchase by passengers during all tours, unless the particular group chartering a private tour or *196 cruise indicated it did not wish to have the snack bar open. In addition, upon request, petitioner provided setups for alcoholic beverages on certain private social cruises. Meals were never furnished by petitioner. No particular employee or employees were in charge of the snack bar operation. Employees on board worked at the snack bar on a rotational basis. Petitioner's daughters and Dorothy Furbee sometimes worked at the snack bar. With regard to walk-on passengers on public tours, fares were collected as the passengers boarded the boat, payment being made primarily in cash. With respect to school tours and social cruises, the particular group also normally paid as it came aboard, either in cash or by check. Only upon request was an invoice (indicating the amount paid) prepared and given to a group which paid upon boarding. Petitioner did not retain copies of these invoices. If the particular group did not pay upon boarding the tour boat, an invoice for the amount due was then prepared, one copy of which was kept by petitioner, the other copy being given to the group. Prompt payment of these invoices was not always made, and petitioner sometimes had to send more than one *197 invoice to a party. No particular person on the boat was specifically in charge of collecting the fares from passengers as they boarded, and petitioner, as well as any of his employees, could have collected such fares. However, petitioner or some other person serving as captain usually collected the fares. Regardless of the particular type of cruise, all passengers boarding the tour boat were counted whether they represented a fare-paying customer or a "freebee" -- a person allowed to ride for free -- such as the teacher of a school group or a child who could not afford to pay. This head count was then written down on a piece of paper and kept at the snack bar. This head count was kept to provide information to the Coast Guard concerning the number of passengers aboard the boat in case of an accident. At the end of each day, the total amount received from snack bar sales was counted and placed into a brown paper bag, along with either the cash register tape or a written notation of the amount. The cash register did not always have a tape in it. This bag [10] and the gross receipts from passenger fares, whether in the form of cash, checks, or invoices (in the case of a group *198 that did not pay upon boarding), were then placed into another paper bag. No count was generally made of the amount of gross receipts from passenger fares before they were placed into the bag. The sheet on which the head count was noted was sometimes also placed into the gross receipts bag, but generally the head-count information was not retained. Certain expenses were paid in cash from the gross receipts for the day. If this was done, petitioner or the employee paying the expense tried to make a notation thereof and place it into the bag at the end of the day. In addition to expenses, cash refunds were sometimes given from the gross receipts of a particular day. Usually this occurred when checks had been made out in advance, and upon boarding, the groups realized they had overestimated the number of people in their group, thereby overpaying the amount of the actual charge for their tour or cruise. *199 In such a case, petitioner or the employee making the refund again attempted to make a notation of such refund and put it into the bag for that day. After the last tour of the day, the money collected from passenger fares and snack bar sales was placed in a bag and the bag was then taken by or given to petitioner. If petitioner was not aboard the boat at that time, the bag was taken by either petitioner's son or Jordan, whoever happened to be the acting captain on the last tour of the day, who would then deliver the bag(s) to petitioner soon thereafter. A number of persons aboard the tour boat had knowledge of the brown paper bags. Once the paper bags came into petitioner's possession, at the end of the day or shortly thereafter, no one except petitioner himself knew what happened to the contents of those bags. At trial, petitioner testified that a bag was made up in the above manner for each day of the tour season. Petitioner testified that he sometimes allowed as many as 12 such individual bags to accumulate at one time, but that he did not, however, continue to maintain the contents of a bag for a particular day in a separate bag for that day, but instead consolidated several *200 bags into one, commingling the receipts of several bags into what petitioner loosely referred to as a "monthly" bag. All of these bags were kept by petitioner either in the trunk of his automobile or at his home. Although petitioner maintained a checking account in the name of Harbor Tours with the branch of the Bank of Virginia located at 600 Washington Street, Portsmouth, Virginia, (hereinafter Bank of Virginia), which he used for both business and personal purposes, petitioner did not deposit all of the gross receipts from the tour boat business therein. Instead, petitioner made deposits only when and in such amounts as needed to cover checks written or to be written on the account. [11] Unlike his treatment of cash receipts, the checks petitioner received in the operation of his tour boat business were promptly withdrawn from the paper bag and either deposited to petitioner's checking account or cashed. Petitioner maintained no record of these checks. Petitioner testified that whenever a check was withdrawn from the paper bag, whether for deposit or to be cashed, a notation of the check amount was made on a piece of paper which was then placed in the bag. When a check was removed *201 and cashed, the money was not returned to the bag since presumably the slip of paper was already in the bag. Any slips of paper in the bag that had been used to record the head count for a particular tour were discarded, considered by petitioner to be of no further value after the tour was over. Any invoices that might have been in the bag were also withdrawn and kept on a clipboard to await payment. Since such an invoice essentially represented a "credit sale," and did not represent money previously received, it is not clear from the record whether petitioner placed a slip of paper into the bag representing such invoice, or instead waited until payment thereof and placed the cash or check into the bag at that time. In addition to expenditures on board the boat, certain other cash expenditures were also made out of the monies in these paper bags. Petitioner testified that when that occurred, the amount of the *202 expenditure was recorded on a slip of paper which was then put into the bag. The remaining amount of money (mostly cash) was either kept in the bags themselves at petitioner's home, kept in a safe at petitioner's home, or kept in one of three safety deposit boxes petitioner maintained at various banks during the years in issue. Money was periodically withdrawn from these sources as needed. At trial, petitioner could give no estimate as to the amount of cash on hand at any one time in either the paper bags, the safe, or the safety deposit boxes. In addition to the cash and checks received on board the tour boat, petitioner also received some tour boat receipts by mail at his home, usually in the form of checks. Petitioner kept no record of these mail receipts. Such checks represented payment for various items, including reservation deposits, group fares, contract prices, and charter fees for future group tours or tours previously taken. At trial, petitioner testified that such amounts received by mail were treated in the same manner as other receipts of the tour boat business, that is, placed in the paper bag with the cash and checks received on the tour boat. Petitioner testified *203 that these amounts were then placed into the bag for the day or month in which the tour to which they were attributable occurred if available; if not, petitioner just put these amounts into the bag for the month of collection. [12]
Method of Recording the Gross Receipts of the Tour Boat Business
Throughout all of the taxable years in issue, petitioner personally and alone kept the books of account for the tour boat business. For each year, petitioner personally maintained books he designated as a Receipts Book, a Cash Disbursements Journal, a General Journal and a General Ledger. As its name suggests, the Receipts Book was used by petitioner to record the gross receipts from the tour boat business for a particular taxable year. The Cash Disbursements Journal, contrary to what its name suggests, was used to record petitioner's expenses *204 paid by check; the General Journal was used to record those expenses paid in cash. Both the expenses paid by check and in cash were then carried to the General Ledger and totaled to arrive at the expense figures petitioner used in computing his income taxes for the years in issue. Petitioner's Receipts Books for the taxable years 1972, 1973, 1974, and 1975 are in evidence. These Receipts Books are informal, consisting of a separate spiral-bound notebook for each year which has been adapted to petitioner's needs. Since many of the issues involved herein focus on these Receipts Books, petitioner testified at length as to how he prepared them. Petitioner did not maintain his Receipts Books over the entire year for any of the taxable years at issue, but only for the portion thereof comprising the tour boat season, beginning with the first day that a tour was offered and ending with the last day a tour was offered for each taxable year. A separate page in the Receipts Book for each year was assigned to each day of the tour season for such year, the day and date being entered on the upper left-hand corner of the appropriate page in the Receipts Book. At trial, petitioner testified *205 that he broke the Receipts Book down in this manner prior to the beginning of the tour season for each year, rather than on a daily basis during the tour season. Receipts of the tour boat business were then entered onto the page of the Receipts Book for a particular day in varying ways, depending upon the source of the particular receipts. Privately chartered tours (school tours and social cruises) were generally [13] listed by time of day and names of the chartering organizations, although charters consisting of more than one group were sometimes listed under only a single group name. Under each group name were figures purportedly [1]4 representing the amount collected from that particular group or groups. A rudimentary "double-entry" system was used to account for receipts from privately chartered tours, a notation under the name on the left side of the page indicating the amount due from the group(s), with a notation on the right side of the page indicating the actual amount collected therefrom. [1]5 *206 Public tours were recorded in an entirely different manner. Notations of different times of day were made in the left-hand margin of the page for a particular day [16] and to the right-hand side numbers representing passenger fares were entered. For the daytime public tours, these passenger fares were generally divided into adult and child; the figure for adult fares appearing first, then followed by a dash and a number representing child fares. The number of adult and child fares on daytime public tours was also often broken down by the port at which the passengers boarded, Norfolk or Portsmouth. [1]7 The passenger fares for the evening public cruises were not broken down into adult and child figures, apparently in light of the fact that a single fare applied to both adults and children on the evening public cruises. *207 A figure representing the receipts from snack bar sales was entered in the upper right-hand corner of the page. Two separate figures are often listed in this space. However, petitioner offered no explanation at trial as to the significance of the second figure. Following the page assigned to the last day of a particular month was a summary page containing information as to the total amount of receipts for that particular month. This information was broken down into the following six categories of receipts: Snacks, Adult, Child, School, Moonlight and Sunset. The parties do not dispute that the monthly total for each of the above-listed categories comports with the figures noted on the pages for the individual days of the particular month. In other words, all of the daily figures for the month add up to the monthly totals. Petitioner's Receipts Books appear on their face to represent daily records and to have been maintained accordingly. At trial, however, petitioner denied that he kept his Receipts Books on a daily basis or considered them as daily records. [18] Rather, petitioner claimed that substantial periods of time normally passed before he "got around" to entering such *208 receipts into the Receipts Book. Petitioner stated that the amounts of snack bar sale receipts were generally placed on the Receipts Book on a monthly basis, since there was state sales tax due on such amounts which had to be reported and paid each month. However, petitioner testified that the remaining gross receipts that were to be entered as passenger fares were not counted and entered into the Receipts Book for the month to which purportedly attributable until after a significant amount of time had passed, sometimes as much as several months later. While the tour season generally ended at some point in September each year, petitioner claimed that preparation of the Receipts Book was not normally completed prior to the close of the taxable year, and that he usually worked on the Receipts Book until his tax returns for the particular year became due, in March or April of the following year. Petitioner indicated that the close of the tour season for a particular year did not mean that the work connected with the tour boat business stopped. However, it did mean there were no further tours and no further brown paper bags containing daily receipts of passenger fares and snack bar *209 sales. During the period between the time collected and the time entered on the Receipts Book(s), petitioner testified, the monies representing such receipts, or the slips of paper recording the amount of withdrawals therefrom, were kept at petitioner's home in either the bags themselves or in petitioner's safe or were kept at the banks in one of his three safety deposit boxes. At trial, petitioner indicated that he employed no procedure to keep the receipts other than snack bar sales (which were recorded on a monthly basis) segregated by the actual month in *210 which collected. Some, but not all, of the bags were dated. Petitioner stated that without the bag being dated he had no way of knowing to which month a particular bag was actually attributable. Petitioner testified that a bag purportedly containing the gross receipts (other than snack bar sales) for a particular month could contain amounts collected in several different months, since he frequently consolidated several separate bags into a single bag. Petitioner testified he placed little emphasis on keeping the gross receipts separated by the month in which collected, explaining at trial that in his view "It made no difference as long as I counted the money and put it on the book." After the close of the tour season for a particular taxable year, petitioner continued to receive from time to time amounts representing payment for prior tours. Petitioner testified that any such amounts received after the close of the tour season were placed into one of the bags if he had not already completed preparing the Receipts Book for such year when the amount was received. Petitioner claimed that he tried to place the money into a bag for the same month in which the tour had occurred if available *211 but, failing that, just put the money into any bag available, whether for an earlier or later month. If the Receipts Book for that particular year had already been completed, petitioner suggested that he then held out the amount and subsequently put it into one of the bags for the next year's tour season. With regard to the actual entry of figures into the Receipts Book, petitioner gave the following explanation. All of the bags purportedly containing the receipts for a particular month were gathered and the money therein or slips of paper representing withdrawals therefrom were counted to arrive at a figure representing the total receipts from all sources for that month. The amount of snack bar sale receipts for the month (of which petitioner claims to have kept a separate monthly record) were then subtracted from this total and recorded in the Receipts Book. With respect to the remaining gross receipts, petitioner testified that he then went back through the month and determined, as best he could from the information available to him, the amounts of receipts derived from school tours and social cruises for that month, entering such amounts as separate categories on the monthly *212 total page. It is not clear from the record whether, or to what extent, petitioner utilized the figures listed under a specific group name in making this allocation, or whether petitioner is in fact claiming that he arrived at the monthly totals first and then went back through his Receipts Book filling in such amounts under the names of private tours or school tours. In any event, petitioner testified that he treated the remaining amounts of gross receipts for the month as fares attributable to walk-on passengers on the various public tours offered. According to petitioner, this lump-sum figure of gross receipts treated as passenger fares was then broken down into separate total monthly amounts for adult fares, child fares, and fares for sunset tours based on the prevailing rates with respect to each type. Petitioner claimed he would then go back through the pages reserved in the Receipts Book for each day of the particular month, and randomly enter beside the time slots listed on the left-hand side of each page a sufficient amount of adult and child passengers for each scheduled daytime tour and a single figure for the sunset cruise so that, in the aggregate, the total number *213 of adult, child, and sunset cruise passengers listed for all the days of a particular month would equal the number of each category required to generate the previously arrived at monthly total for amounts treated as passenger fares. Petitioner testified that the passenger figures listed for the various daytime public tours and sunset cruises are incorrect as to the actual number of passengers on such tours or cruises, and further indicated that a number for passengers may be listed on his Receipts Book(s) for a particular public tour or cruise which did not in fact occur. [19] While acknowledging that his Receipts Books are inaccurate as to the number of passengers listed for the particular public tour, [20] petitioner steadfastly maintained that they are accurate as to the total amounts of receipts treated as walk-on passenger fares for public tours, as well as the other categories of receipts listed on the monthly summaries. *214 Once petitioner had entered the amount of receipts for a particular month in his Receipts Books, he threw away all documentation which had been in the bag(s) purportedly attributable to that month and which reflected the amount of gross receipts contained therein. Any cash register tapes or other notations of the amount of snack bar sales found in the bags, as well as the bags themselves, were thrown out. Any slips of paper noting the head count for a particular tour which may have found their way into the bag(s) and any slips of paper recording the amount of withdrawals from the gross receipts bag(s) for refunds or payment of expenses were likewise thrown away. Thereafter, petitioner claims to have relied solely on his Receipts Book as the record of the amount of gross receipts from the various sources. At the back of each of the Receipts Books introduced into evidence herein is a page listing the yearly totals by category for the various categories of income petitioner utilized in preparing his monthly summary pages. Petitioner indicated at trial that such a yearly summary was prepared each year subsequent to the preparation of the monthly summaries. These yearly summaries *215 in the Receipts Books indicate that petitioner had the following gross receipts from the listed categories during the years in issue as follows: 1972
1973
1974
1975
Snacks:
$ 9,555.90
$11,464.15
$14,054.73
$ 18,527.82
Adults:
23,970.00
29,124.00
33,277.50
48,770.00
Child:
3,777.00
1,708.00
1,661.00
2,129.00
School:
8,664.00
7,664.00
9,908.60
11,352.50
Moonlight:
3,975.50
6,250.50
7,618.50
11,117.58
Sunset:
9,132.00
11,556.00
12,417.00
23,204.00
Dock Rental:
2,190.00
Total
$59,074.40
$67,766.65
$78,937.33
$117,290.90
The total for taxable year 1972 was then reduced by the sum of $184.50 to reflect a discount apparently given a customer, leaving total gross receipts for taxable year 1972 in the amount of $58,889.90. The total amount of gross receipts listed above and reported on the yearly summary page of petitioner's Receipts Books for taxable years 1972, 1973, 1974, and 1975, respectively, (after adjusting the total figure for taxable year 1975 to reflect "dock rental fees" reported in the Receipts Book for that year and discussed in more detail hereinafter) reconcile with the amount of gross receipts from *216 the tour business petitioner reported on the Schedule C's attached to his income tax returns for such years. In other words, the amount of gross receipts reported on petitioner's Schedule C for the tour boat business each year is the same as the yearly summary from the Receipts Book for that year, which is the total of the monthly summaries in that book, which in turn is the total of the daily entries in that book. Other Records Maintained
As noted earlier, in addition to the Receipts Book, petitioner also maintained, as part of his business records for each taxable year, a book he called a Cash Disbursements Journal which was used to record all the expenses petitioner paid by check during such year, whether personal or business related. Copies of petitioner's Cash Disbursements Journals for taxable years 1972, 1973, and 1974 [21] have been introduced into evidence herein. Those Cash Disbursements Journals are very detailed and complete, breaking each taxable year down on a monthly basis and containing a numerical listing of all checks written during a particular month, along with the date, payee, and amount of each check. At a separate point, the checks for each month are *217 then assigned to one of several accounts listed in the journal, depending upon the nature of the particular expense or whether for business or personal purposes. In August of 1974, petitioner met with James E. Wharton concerning the possible sale of his tour boat business to Wharton. Also present at this meeting was Wharton's son and Grant Ballard, a certified public accountant representing Wharton in the sales negotiations. During the course of the meeting the parties discussed the manner in which petitioner ran the business, inquiring into the income and expenses of the business over the last three years. In response to Ballard's questions, petitioner provided him with information purportedly representing his income from the tour business for taxable years 1971, 1972, 1973 and the portion of 1974 up to the date of the meeting, as well as his expense figures *218 for the tour business' 1971, 1972, and 1973 taxable years, the expense figures for taxable year 1974 having not yet been completed. Petitioner presented four notebooks to Ballard, [22] a separate notebook for each year, each of which contained a separate page in the back thereof entitled "Summary." Listed on the Summary sheet for each year was a figure representing the gross receipts and expenses for that year with some breakdown thereof into its component parts, as well as a more detailed listing of the various expenses incurred in petitioner's tour business for taxable years 1972 and 1973. Ballard did not examine the notebooks closely -- other than flipping through the pages thereof to be sure there was in fact information listed on the pages of the book -- nor in any manner attempt to verify the figures listed on the Summary sheets, but merely copied these figures onto a separate sheet of paper, a copy of which was introduced into evidence herein. [23] These Summary sheets indicate that petitioner's tour business had gross receipts in the amounts of $103,253, $110,379, and $116,090 for taxable years 1972, 1973, and 1974, respectively. *219 At the time he copied the information listed on the Summary pages, Ballard also requested to see petitioner's tax returns for the taxable years 1972 and 1973, the return for taxable year 1974 having not yet been prepared. Petitioner initially responded that it would do no good to compare his returns with the Summary pages, indicating that they would not reconcile with each other. Ballard again requested the returns, which petitioner then furnished for his inspection. Ballard perused only the Schedule C attached to the return for each year, and did not copy any information therefrom. [24]
*220 The Schedule C's attached to petitioner's 1972 and 1973 returns (in conformity with the Receipts Books for those years introduced into evidence herein) reported gross receipts for such years in the amounts of $58,889.90 and $67,766.65, respectively; the Summary pages indicated petitioner's gross receipts for such years to be $103,253 and $110,379, respectively. The expense figures listed on the Summary pages for 1972 and 1973 exactly matched (with the exception of depreciation) all of the expense deductions claimed on the Schedule C's attached to petitioner's 1972 and 1973 returns. Ballard commented, after inspecting such Schedule C's, that they did not reconcile with the Summary pages for those years, but he neither sought nor received a further explanation thereof from petitioner. [25]
*221 An investigation into petitioner's tax liabilities for taxable years 1972, 1973, and 1974 [26] was commenced following information received by the Internal Revenue Service from a third party on July 15, 1975. This third party provided respondent's agents with purported gross receipts figures of petitioner's tour business for the taxable years 1972, 1973, and up to August of 1974. These figures were obtained from notations and schedules that had been prepared from the Summary sheets petitioner had furnished to Ballard in connection with the purchase negotiations concerning the tour business in August of 1974. These gross receipts figures were substantially in excess of those reported by petitioner on the Schedule C's attached to his returns for such years. The investigation undertaken was a joint investigation of petitioner's potential criminal and/or civil liabilities for those years; the criminal investigation conducted by Special Agent Robert E. Burgess (Agent Burgess), the civil investigation conducted by Revenue Agent Tom Brown. At trial, Agent Burgess testified at great length about the details and results of his criminal investigation; Revenue Agent Brown did not testify. *222 Agent Burgess' first contact with petitioner occurred on the morning of April 20, 1976. A special agent named Mike Dunlow, who did not testify herein, was also present at this meeting. As his investigation was to be criminal in nature, Burgess identified himself as a special agent and informed petitioner of his constitutional rights, which petitioner indicated he understood. Burgess also informed petitioner of his duties as a special agent. [27]
Prior to this initial meeting, *223 Agent Burgess had obtained and reviewed copies of petitioner's 1972 return and the original returns filed for 1973 and 1974. Agent Burgess showed petitioner copies of these returns which petitioner identified. Petitioner indicated that he had prepared these returns himself without assistance and that they reported all of his income during those years. With the aid of a form outline commonly used when interviewing taxpayers, Agent Burgess then went over these returns with petitioner line by line. With regard to the Schedule C's attached to these returns, petitioner gave Agent Burgess a brief explanation of the operation of the tour boat business and the method used to report the income therefrom. Specifically, Agent Burgess testified that petitioner told him a notation was made on a piece of paper as to how much money was collected, which was turned over to petitioner at the end of each day and recorded in the gross receipts book, after which the piece of paper was thrown away. Petitioner acknowledged that the money was not all deposited in his bank account, instead being kept at petitioner's home or on his person. Agent Burgess asked petitioner about his bank accounts, to which *224 petitioner responded that he had one checking account in the name of Harbor Tours which was used for both business and personal purposes. Petitioner further stated that he had no savings accounts, but did have some savings certificates and gave Agent Burgess the names of those institutions. [28]
Agent Burgess also asked petitioner about safety deposit boxes, to which petitioner responded that he had a safety deposit box in his name at the Bank of Virginia. Agent Burgess did not question petitioner as to the *225 contents of this safety deposit box. Petitioner did not mention any other safety deposit boxes. Specifically, petitioner failed to disclose the existence of the two additional safety deposit boxes he maintained in his own name during the years in issue. Also, at no time during this initial interview did petitioner mention anything about his alleged system of bookkeeping utilizing the various "bags" filled with money as discussed above. Agent Burgess also asked petitioner about the amount of cash on hand, to which petitioner originally replied that "a working man doesn't accumulate cash." In an attempt to get a dollar figure, Agent Burgess asked petitioner if he could have accumulated as much as $1,000, to which petitioner responded affirmatively; Agent Burgess then asked petitioner if it could have been as much as $2,000, to which petitioner once again responded affirmatively. At the conclusion of this initial meeting, Agent Burgess made arrangements to pick up any records petitioner had pertaining to taxable years 1972, 1973, and 1974 and did so at a second meeting later in the afternoon of the same day. This second meeting lasted approximately 20 minutes and took place at *226 the dock from which petitioner operated his tour business. Petitioner provided Agent Burgess with three metal boxes which contained petitioner's Receipts Books, Journals, and Ledgers referred to above, and which together comprised all of the records petitioner ever furnished respondent for taxable years 1972, 1973, and 1974. [29] There were no invoices, reservation confirmation sheets, or contracts or any documents of this nature used in the tour business in any of the three boxes petitioner gave to Agent Burgess during this second meeting on April 20, 1976, nor were any documents of this type supplied to Agent Burgess at anytime during his investigation. [30]
*227 Petitioner took one of the Receipts Books from the metal boxes, opened it on the trunk of his car, and gave Agent Burgess a brief explanation of the information listed therein. Petitioner told Agent Burgess that each day's business was recorded separately in the Receipts Book(s), each page representing a particular day's business. Petitioner then explained that each page was further broken down by the nature of the particular receipts in question, showing Agent Burgess examples of how snack bar sales, school cruises, moonlight cruises, and public tours were reported in the Receipts Book. Petitioner told Agent Burgess that public cruises (including sunset cruises) were listed as a head count of the number of people boarding the boat, broken down into adult and children passengers, then further broken down by the port from which boarded, again showing Agent Burgess an example in the Receipts Book. In all, petitioner flipped through several different pages in the Receipts Book explaining how various items were reported therein. Petitioner made no other comments to Agent Burgess at this time concerning how his gross receipts were kept. [31] No mention of any system of record keeping *228 involving "bags" filled with receipts from the tour business was mentioned, nor did petitioner indicate that a substantial period of time passed between the collection of gross receipts in his tour business and the recording thereof on the Receipts Books. *229 Petitioner also gave a brief explanation of the other books (Cash Disbursements Journal, General Journal, and General Ledger) contained in the metal boxes, but only to indicate in general what the books were and their purpose. Petitioner did not open these books to show any examples of the items listed therein. However, the issues in this case involve primarily the gross receipts and not the expense items. Following the meeting with petitioner on April 20, 1976, Agent Burgess began an extensive investigation into petitioner's financial affairs and the operation of the tour boat business to determine whether petitioner's Receipts Books for taxable years 1972, 1973, and 1974, [32] which reconciled with the original returns filed for those years, accurately reported petitioner's income for those years. A summons was served upon the Bank of Virginia to obtain the records of the checking account petitioner maintained there during the years in issue. Copies of deposit slips, checks drawn on the account, and customer checks collected through the account were obtained, providing additional information as to customers of petitioner's tour business during those years. A letter was sent *230 to area schools. Contact was made with and documents such as cancelled checks, invoices, and reservation confirmations were obtained from schools and organizations listed by name in petitioner's Receipts Books for 1973 and 1974. From these contacts, Agent Burgess also learned of other schools and organizations which had been customers of petitioner's tour boat business during taxable years 1973 and 1974. These other schools and organizations were then subsequently contacted and similar documents obtained from them. In all, at least 100 former customers were contacted in connection with Agent Burgess' investigation for those years. During the course of his investigation, Agent Burgess also contacted several of petitioner's employees and other persons associated with the tour boat business in an attempt to learn more about the operations thereof. These persons included Jordan, Furbee, petitioner's son, and Gayle McDowell, one of petitioner's daughters. From his interviews with these people, Agent Burgess first learned of the brown paper bags used in the collection of the gross *231 receipts from the tour boat business. None of these individuals had any personal knowledge or information about the recording of such receipts into petitioner's Receipts Books. In an attempt to corroborate the items listed in the 1973 and 1974 Receipts Books, Agent Burgess prepared a schedule therefrom listing all the private tours [33] reported in the Receipts Book. He then compared this schedule to the third-party documents he had obtained from the schools and tour groups. As a result of this comparison, Agent Burgess uncovered the following items which the parties have now stipulated cannot be found reported "as such" -- that is, as a school tour or as a private tour -- in petitioner's Receipts Books for 1973 and 1974: [34]
1973
Amount
Identified
Amount
Name
Date
Amount Paid
As Reported
Unidentified
Virginia District N.Y.P.S.
None
$ 50.00
0
$ 50.00
Chamberlayne Elementary School
5/11/73
$140.00
0
$ 140.00
Grand Commandery Committee of
5/11/73
$200.00
0
$ 200.00
the Knights Templar of Va.
Dr. Israel Brown AZA/Kruger BBG
5/12/73
$305.00
0
$ 305.00
Norfolk Elks Lodge #38
5/20/73
$600.00
$310.00
$ 290.00
Friends School
5/21/73
$109.80
$ 48.85
$ 60.95
Madison County High School
5/25/73
$134.00
0
$ 134.00
Employees Welfare and Recreation
5/26/73
$464.00
$358.80
$ 105.20
Assoc.-Navy Regional Finance
(Sales tax
Center
Not included)
Stanwick Employees Fund-
6/2/73
$449.00
$360.85
$ 88.15
Stanwick Corporation
(Sales tax
Not included)
Hebrew Academy of Tidewater
6/14/73
$ 83.00
0
$ 83.00
Mrs. Connie Beukema's Group
6/23/73
$120.00
$ 69.00
$ 51.00
Club Managers Association of
6/25/73
$228.00
$ 28.60
$ 199.40
America-Tidewater Chapter
(Sales tax
Not included)
Harry's Ship-Stores
7/16/73
$482.64
$309.20
$ 173.44
Reid School
7/23/73
$112.00
0
$ 112.00
Duplex Club
9/73
$225.00
0
$ 225.00
Awards Board of Norfolk
9/15/73
$150.00
0
$ 150.00
Naval Supply Center
9/20/73
$190.00
0
$ 190.00
Employees Activities
Association
Norfolk Naval Shipyard
9/22/73
$234.00
0
$ 234.00
Officers Wives Club
Mutual Federal Savings & Loan
9/23/73
$537.00
$324.80
$ 212.20
Association of Norfolk
(Sales tax
Not included)
Auxiliary to the Norfolk
9/26/73
$337.50
0
$ 337.50
General Hospital Division of
Medical Center Hospitals
Allied Officers Armed Forces
9/27/73
$199.75
$ 24.75
$ 175.00
Staff College
Delta Gamma Chapter of Kappa
9/30/73
$190.00
0
$ 190.00
Alpha Order
TOTAL AMOUNT UNIDENTIFIED
$3,705.84
*232 1974
Amount
Identified
Amount
Name
Date
Amount Paid
As Reported
Unidentified
Dr. Israel Brown AZA
None
$ 50.00
0
$ 50.00
Needlework Guild of Norfolk
4/23/74
$252.00
0
$ 252.00
Churchland Baptist Church
4/24/74
$106.25
0
$ 106.25
Kindergarten
Stuart School
5/6/74
$112.50
0
$ 112.50
Larrymore Elementary School
5/7/74
$122.50
$ 10.00
$ 112.50
The York Club of Trinity
5/16/74
$225.00
0
$ 225.00
Episcopal Church
Armed Forces Staff College
5/17/74
$225.00
0
$ 225.00
Seminar 7, Class 55
Peat, Marwick, Mitchell & Co.
5/18/74
$413.00
0
$ 413.00
Crossroads Elementary School
5/20/74
$223.75
$120.00
$ 103.75
First Baptist Church Youth
5/22/74
$225.00
0
$ 225.00
Group
Aesop Schools, Inc.
5/23/74
$ 68.75
0
$ 68.75
St. James Episcopal Church
5/25/74
$335.00
0
$ 335.00
Mens Club
Arrowhead Elementary School
5/29/74
$183.75
$108.75
$ 75.00
Point O'View Elementary School
5/30/74
$ 62.50
0
$ 62.50
Armed Forces Staff College
5/31/74
$225.00
0
$ 225.00
Seminar
Newtown Road Elementary School
6/4/74
$ 67.50
$ 7.50
$ 60.00
Trinity Lutheran Church School
6/6/74
$ 97.50
0
$ 97.50
Bugs Club
6/6/74
$335.00
$ 54.85
$ 280.15
John E. Krome's Party
6/7/74
$288.85
$115.70
$ 173.15
Frederick Travel Club, Inc.
6/9/74
$197.00
$ 15.80
$ 181.20
(Sales tax
Not included)
Welfare & Recreation Assoc.
6/9/74
$270.00
0
$ 270.00
Naval Supply Center
Parkview Baptist Church
7/1/74
$456.00
0
$ 456.00
Portsmouth Recreation Dept.
7/30/74
$223.75
$122.50
$ 101.25
Courts of Calanthe 287
9/7/74
$245.00
0
$ 245.00
(The Gay Mardnetts)
Virginia Beach Pests
9/20/74
$371.00
0
$ 371.00
Door Engineering Corporation
9/21/74
$257.70
$ 32.70
$ 225.00
Auxiliary to the Norfolk General
9/25/74
$276.00
0
$ 276.00
Hospital Division of the Medical
Center Hospitals
Faculty Wives Club of Tidewater
9/27/74
$225.00
0
$ 225.00
Community College
Liberty Spring Sunday School
9/29/74
$442.54
$ 15.85
$ 426.69
Belk Leggett Advertising
10/1/74
$505.75
$448.20
$ 57.55
Display Assoc.
(Sales tax
Not included)
Chowan 4-H Club
10/4/74
$273.00
0
$ 273.00
Central Christian Academy
10/5/74
$175.00
0
$ 175.00
Delta Gamma Chapter of
10/6/74
$315.00
$225.00
$ 90.00
Kappa Alpha Order
TOTAL AMOUNT UNIDENTIFIED
$6,574.74
*233 The parties have stipulated that all of the above tours in fact occurred and occurred on the date listed. Based on the above information, Agent Burgess determined that petitioner had underreported his receipts from the tour boat business for taxable years 1973 and 1974 in the amounts of $3,705.84 and $6,574.74, respectively. With regard to the taxable year 1972, Agent Burgess interviewed Haddock and obtained from her the copies of the reservation sheets she prepared during that year and which have been introduced into evidence herein. In discussing the preparation of such reservation sheets, Haddock indicated to Agent Burgess that scheduled tours often rescheduled their trip for another day, sometimes *234 cancelling the trip altogether. She had no personal knowledge or information as to which tours had in fact been cancelled. Other than those reservation sheets, Agent Burgess obtained no third-party documentation from former customers pertaining to taxable year 1972. In other words, for 1972 Agent Burgess did not obtain any cancelled checks, invoices, or confirmation sheets from customers. Utilizing only those reservation sheets for which there were no corresponding entries in petitioner's 1972 Receipts Book and which had not been marked as cancelled on the face thereof, Agent Burgess made a determination that petitioner had underreported the gross receipts from the tour boat business in the amount of $6,112.50 for taxable year 1972. [35]
*235 At the time he determined the above stated amounts of unreported gross receipts from the tour boat business with respect to taxable years 1972, 1973, and 1974, Agent Burgess was in possession of the purported gross receipts figures which petitioner had given to Ballard during the August 1974 purchase negotiations. While he indicated that such figures were used in his investigation, Agent Burgess did not utilize those purported gross receipts figures in computing the amounts of unreported gross receipts he determined to exist for those years. He indicated that his failure to do so was based on the fact that he had not actually seen the records which Ballard had been given by petitioner. [36]
*236 As a result of Agent Burgess' investigation and apparently with respect to the specific items of gross receipts set out above which could not be identified as reported in petitioner's Receipts Books for taxable years 1973 and 1974, petitioner was subsequently indicted and tried on two counts of having violated section 7206(1) by reason of having understated the gross receipts of the tour boat business on his 1973 and 1974 income tax returns. In an unreported criminal case [37] decided August 15, 1979, petitioner, who did not testify in his criminal trial, was acquitted of both counts. [38]
*237 Following his acquittal in the criminal case, petitioner's civil income tax file was returned to the Examination Division of the Internal Revenue Service for evaluation. Based on the information obtained during the criminal investigation, a decision [39] was made to proceed civilly against petitioner. However, in the civil tax proceeding, respondent did not limit the deficiencies to the specific items of unreported income determined by Agent Burgess. This resulted in the notice of deficiency herein pertaining to petitioner's 1972, 1973, 1974, and 1975 taxable years. With respect to taxable years 1972, 1973, and 1974, adjustments were made to the gross receipts figures for the tour boat business reported on petitioner's income tax returns for such years to reflect the higher figures that petitioner had given to Ballard in August of 1974. This resulted in increases over the gross receipts figures reported on petitioner's 1972, 1973, and 1974 returns in the amounts of $44,363.10, $42,612.35, and $37,152.67, respectively. *238 With respect to taxable year 1975, respondent simply increased the gross receipts figure reported on petitioner's 1975 return, $117,292, by 61.76 percent, the average percentage by which respondent had determined the gross receipts of the three preceding taxable years had been underreported. [40]
Dividends, Dock Rental Fees, Reimbursed Business Expenses
In addition to the gross receipts from the tour boat business, respondent also determined petitioner failed to report as income amounts received as dividends, dock rentals, and reimbursed business expenses. Petitioner has stipulated that during the taxable years in issue he derived income from dividends, dock rental fees, and reimbursed business expenses as follows: Dividends
Payor
1972
1973
1974
1975
International Harvester
$ 63.00
$ 67.50
$ 72.02
$ 76.52
Niagara Mohawk Power
1.67
49.32
113.22
Corp.
Colonial Income Fund
80.32
81.55
79.29
73.84
U.S. Life Funds
164.01
190.91
19.00
192.00
Virginia Electric and *
Power Company
236.00
$309.00
$389.28
$170.31
$691.58
*239 Dock Rental Fees
Payor
1972
1973
1974
1975
E. J. Fleming
$ 90
$450
$ 180
$ 360.00
Corrine B. Dorsey
105
225
450.00
Carlton J. Wilkins
300
480
400.00
Peter H. Kamenik
75
25.00
Carol B. Starck
50
Richard P. Moraski
200
325.00
Lawrence A. McDowell *
29
40.00
John F. Coffey
75.00
Charles B. Herter, Jr. ** 1,701.30
John Creecy
100.00
Joseph Moraski
250.00
Jacob W. James, Sr.
175.00
Robert L. Old
250.00
Total
$195
$975
$1,014
$4,151.30
Reimbursed Business Expenses
Payor
1973
1974
Colorcraft Corporation
$170.52
$224.30
C & P Telephone Company
17.81
7.77
Total
$188.33
$232.07
In his notice of deficiency, respondent has also determined that during the taxable year 1974 petitioner received additional income from Furbee in the form of reimbursed business expenses in the amount of $47.94. Other than certain hearsay statements elicited at trial concerning statements Furbee made to Agent Burgess, no evidence with respect to this particular item has been introduced herein. *240 None of petitioner's Receipts Books for any of the taxable years in issue contain any separate listing for any amount of the dividends or reimbursed business expenses which petitioner has stipulated he received during those years. Nor do petitioner's Receipts Books for taxable years 1972, 1973, and 1974, respectively, contain any separate listing for any amount of the dock rental fees which petitioner has stipulated he received during those years. Petitioner's Receipts Book for taxable year 1975 does contain a separate listing in the monthly totals for dock rentals, reporting the following amount of dock rentals during that year: Month
Dock Rentals
May
$ 750
June
July
August
September
1,440
Total
$2,190
A notation on both the first page of the Receipts Book and on the page containing the monthly summary for May indicates that the $750 entered for that month represents dock rentals collected in 1974 but omitted from the Receipts Book for that year. [41] Except for dividends in the amount of $192 received from U.S. Life during 1975 reported on his 1975 return and dividends in the amount of $187.31 from an undisclosed source reported on his 1974 return, *241 [42] petitioner's returns for those years do not list any other amounts of income from dividends "as such." With regard to rental income, petitioner's 1972, 1973, 1974, and 1975 returns report gross rental income in the amounts of $6,150, $6,000, $6,100, and $6,600, respectively, attributable to the rental of two cinder block buildings located in Portsmouth, Virginia. The returns for those years do not report any amounts of income from dock rental fees "as such." Nor do such returns report any amounts of income from reimbursed business expenses "as such." *242 During the initial interview with Agent Burgess on the morning of April 20, 1976, petitioner either lied to him or told him half-truths. Petitioner, in response to questions concerning ownership of stocks and bonds, stated that he did not own any. Petitioner owned stocks. The subject of rental income was also discussed during this initial meeting. Agent Burgess and petitioner went over the Schedule E's attached to petitioner's 1972, 1973, and 1974 taxable years' returns, petitioner stating that he had no other rental income for such years other than the amounts reported and attributable to the two cinder block buildings. Specifically, petitioner did not mention anything about dock rentals to Agent Burgess. [43]
*243 During the course of the second meeting on April 20, 1976, Agent Burgess noticed several boats docked at petitioner's pier near the waterfront and asked him about these boats. In response, petitioner stated that "you know how people are, they're always bringing derelicts in on top of you." Petitioner did not tell Agent Burgess at that time that he received dock rental fees with regard to such "derelicts." On May 24, 1976, Agent Burgess again met with petitioner [44] at the office of Willard Moody, the attorney who was then representing petitioner. Agent Burgess asked petitioner about stock ownership, to which petitioner replied that he could not remember what stock he owned. Agent Burgess indicated to petitioner that he could not find certain dividend income listed which petitioner had received, to which petitioner replied that such amounts were in his "books," meaning the Receipts Books. Agent Burgess then informed petitioner that he had examined the Receipts Books and could not find any dividends reported therein, and asked petitioner to show him where they were reported. Petitioner replied by stating that he did not know where they were either, but knew they were in the "books. *244 " At trial petitioner reiterated this claim, extending its coverage to include not only the dividends which he has now stipulated he received, but also to include the dock rental fees and reimbursed business expenses he has likewise stipulated he received. Petitioner testified that all of the above-listed amounts of dividends, dock rental fees, and refunds of business expenses were considered by him to represent income attributable to the Harbor Tour business and were treated the same way as any other gross receipts from that business, that is, they were placed in the bags and commingled with the gross receipts from passenger fares. Jordan partially corroborated petitioner's testimony in regard to dock rentals, testifying that from time to time he (Jordan) collected cash or checks for dock rentals which were placed in the bag with the gross receipts from passenger fares. [45]Jordan, however, had no personal knowledge or information as to what happened to the cash or checks for *245 dock rentals once they came into petitioner's possession. Jordan specifically had no personal knowledge or information about the entries in petitioner's Receipts Books. With respect to the amounts of dock rental fees separately listed as such in petitioner's 1975 Receipts Book (and reflected in the total gross receipts reported on petitioner's 1975 Schedule C), petitioner stated that he first started keeping records of the amount of dock rental fees received in the latter part of 1974, departing from his earlier practice of simply placing them in the bag. Petitioner stated that he kept a small notebook *246 in his pocket on which he recorded the amount of dock rental fees paid to him personally, but indicated that such record was still incomplete, since any dock rentals collected by other persons on the boat would still have gone into the bag with the gross receipts, no record thereof being made. With respect to taxable year 1975, petitioner stated that he began keeping a record of the rentals which he considered "permanent" -- lasting more than two to three months in duration -- recording the amount thereof in his notebook by the name of the lessee. Petitioner indicated he had brought such records to the trial pursuant to a Government subpoena, but they were not offered or received in evidence herein. Petitioner again stated that amounts received by other persons on the boat would have been placed into the receipts bag without being entered in his notebook, acknowledging that there were amounts collected as dock rentals which were not listed as such in his 1975 Receipts Book. Petitioner claimed that such amounts were nevertheless recorded therein as passenger fares, thus being reflected in the gross receipts figures reported on his tax returns. Interest Income
a. The Loan *247 Transaction During the initial meeting with petitioner on April 20, 1976, Agent Burgess also asked petitioner about any loans he may have received or made to someone else. Petitioner indicated he had no loans payable, expressing his opinion that if you borrowed money from the bank, the bank then owned you. When asked if he had ever loaned anyone any money, petitioner stated that from time to time he loaned small amounts of money to the boys who worked on the boat, deducting it from their pay at the end of the week. Other than such advances, petitioner did not disclose the existence of any other loans he might have made to anyone else. [46]
Agent Burgess subsequently discovered, and petitioner now acknowledges, that he had in fact loaned $20,000 to his brother, Lawrence H. McDowell (Lawrence), on May 20, 1974. [47]
*248 Lawrence did not appear or testify at trial, the evidence offered concerning the loan consisting almost entirely of petitioner's testimony thereon. [48] Petitioner claimed the loan was a "hand shake" deal, intended to be interest-free. Lawrence understood otherwise. See n. 48, supra. However, petitioner acknowledged that he and his brother orally provided for the payment of eight percent interest on the unpaid balance thereof, petitioner indicating the interest provision was to act only as a "safeguard" in case something happened to Lawrence, not intended to be enforced. *249 Monthly payments in the approximate amount of $206 each were thereafter received on the loan, petitioner indicating that Lawrence had established the amount of the monthly payments. Petitioner denied that any of the monthly payments received during the years in issue contained any interest increment, stating that he regarded all such amounts to be repayment of principal. [49] Petitioner indicated he had maintained a contemporaneous record of such payments which would reflect his claimed treatment thereof. Although he apparently had such a record in his possession while testifying, it was not offered into evidence, and his testimony in that regard was extremely vague. Neither of petitioner's *250 tax returns for taxable years 1974 or 1975 reports any amount of interest income from this loan. In his notice of deficiency pertaining to those years, respondent determined that petitioner received interest income from the loan to his brother during taxable years 1974 and 1975 in the amounts of $660.80 and $1,536.00, respectively. b. Sale of the House
During the late 1960's, petitioner sold a house located in Portsmouth, Virginia (the Portsmouth house) to his son, Walter M. McDowell, Jr. The sale was seller financed by petitioner, with a total purchase price of $9,500, payable in monthly increments of $65. The $65 monthly payment included interest on the unpaid balance, but petitioner's son could not recall the exact percentage. Petitioner's son also paid the property taxes on the house. During the early 1970's the house was returned to petitioner in return for a full refund of the amounts paid on the purchase price, including the interest paid. In January of 1972, petitioner's son repurchased the house. This purchase was likewise seller financed by petitioner, the total contract price once again $9,500. A written contract of sale was executed calling for a $600 down *251 payment with monthly payments thereafter in the amount of at least $100 each, with five percent interest on the unpaid balance. The agreement also provided that petitioner's son was to pay all property tax. At trial both petitioner and his son testified that, contrary to the express terms of their written contract of sale, the transaction was intended to be interest-free. Petitioner's son speculated that the contract provided for interest to avoid "problems" in case anything happened to himself or petitioner. However, petitioner's son acknowledged that he had nevertheless claimed interest deductions on his own tax returns with respect to the purchase of the house. Petitioner's son sold the house to a third party in 1977, using the sale proceeds to discharge the outstanding balance owing to petitioner. The payment record maintained by petitioner indicates that between the purchase in 1972 and the sale to a third party in 1977, petitioner received payments from his son with respect to the house totaling $10,460, charged on petitioner's payment record as follows: Year
Amount Paid
Principal
Property Tax
1972
[1] $ 1,610
$1,415.12
$194.88
1973
1,050
896.55
153.45
1974
1,300
1,109.02
190.98
1975
1,300
1,071.48
228.52
1976
900
671.48
228.52
1977
4,300
4,300.00
Total
[2] $10,460
$9,463.65
$996.35
*252 Petitioner's payment record does not list any amount received from his son with respect to the sale of the house as interest. Petitioner's 1972, 1973, 1974, and 1975 tax returns also report no interest income from the sale of the Portsmouth house. In the notice of deficiency, respondent determined that petitioner had in fact realized interest income from such transaction in the amount of $244.20 with respect to each of his 1972, 1973, 1974, and 1975 taxable years. Additional Business Expenses Claimed by Petitioner for 1972
During the taxable years in issue, petitioner purchased film from a company known as Consolidated, such film then being sold to the public from the snack bar on petitioner's tour boat. The parties have introduced into evidence two separate checks drawn on petitioner's bank account during June of 1972 and the matching invoices therefor, both checks payable to Consolidated and in the respective amounts of $291.26 *253 and $202.96. In petitioner's books of account, these two payments were charged to account number 390, which was petitioner's personal drawing account. These payments were not charged to account number 242, which was reserved for expenses attributable to "stock on boat," nor to any other account used to record expenses of petitioner's tour boat business. These payments were thus not listed as expenses or cost of goods sold on petitioner's books and records nor, consequently, on his 1972 tax return. During the years in issue, petitioner also purchased supplies from Coca-Cola Bottling Works, Inc. of Norfolk, Virginia (Coca-Cola) for resale to passengers from the snack bar. The parties have introduced into evidence a copy of a statement from Coca-Cola which indicates that a payment in the amount of $724.90 was made on petitioner's account during September of 1972. This payment likewise was not charged to account number 242, "stock on boat," nor to any other account used to record expenses attributable to petitioner's tour business. This payment was thus also not listed as any form of expense or cost of goods sold on petitioner's books and records nor, consequently, on his 1972 tax *254 return. [50]
Travel and Entertainment Expense
Petitioner has also introduced copies of checks drawn on petitioner's checking account at the Bank of Virginia during taxable year 1972 as follows: Check No.
Payee
Amount
2726
C.W. Visitor Services
$ 15.00
2954
Doug Owens Band
90.00
2971
Greek Lines
1,277.50
2983
Greek Lines
150.00
Total
$1,532.50
In addition, petitioner has introduced copies of miscellaneous receipts and records with various dates in 1972 reflecting amounts totaling $522.70 which were paid or reimbursed through the petty cash account (referred to hereinafter as the petty cash expenditure) of petitioner's books *255 maintained for the tour business. The two checks payable to Greek Lines, totaling $1,427.50, represent fares for a cruise from Norfolk, Virginia to the Bahamas during 1972. This cruise was taken by petitioner, Furbee, petitioner's two daughters, Jordan, and another employee named Mark Johnson. At trial, petitioner introduced into evidence a one-page document written on the letterhead of the tour business and allegedly related to this cruise. The document lists the individual passenger fares for petitioner's two daughters, Jordan, and Johnson, stating the total of the passenger fares to be $963.50. [51] At the bottom of the document is a handwritten notation "For a job well done." Jordan, under questioning by petitioner's counsel at trial, could not recall whether there was any specific purpose or reason for the trip, and could not remember whether petitioner had ever told him the purpose of the trip. No other evidence pertaining to this trip was introduced. *256 The $90 check to the Doug Owens Band was for musical entertainment. No other evidence pertaining to this expenditure was introduced. No evidence was introduced as to the $15 check to C. W. Visitor Services. With respect to the petty cash expenditures, the receipts and records introduced with respect thereto indicate that the majority of such expenditures represent motel bills, the remainder consisting of expenditures for mileage or meals. Only a few of the receipts or records contain a notation as to the alleged purpose of the expenditure. Other than the receipts or records themselves, no other evidence was introduced as to the petty cash expenditures. The $15 check to C. W. Visitor Services, the $90 check to Doug Owens Band, $963.50 of the $1,277.50 check to Greek Lines, and the $522.70 petty cash expenditures were all charged to account number 72, "Travel and Entertainment" at certain points in petitioner's books and records, but it is not clear whether such treatment was uniform throughout. The $150 check to Greek Lines and the remaining $314 of the $1,277.50 check thereto were charged to account number 390 in the Cash Disbursements Journal, petitioner's personal drawing *257 account. On his 1972 tax return, petitioner claimed travel and entertainment expenses in the amount of $820.40. There is no breakdown of the component parts of this total listed on petitioner's return. In the notice of deficiency pertaining to taxable year 1972, respondent disallowed $730.63 of the claimed deduction, allowing the remaining amount claimed, $89.77. Petitioner now contends that all of the expenditures set out above represent deductible travel and entertainment expenses. Income Averaging
On his 1977 tax return, petitioner elected income averaging, listing as taxable income for his base period years 1973, 1974, and 1975 the amounts of taxable income reported on the tax returns filed for those years. In his notice of deficiency pertaining to taxable year 1977, respondent utilized the higher taxable income figures for such years arising from the various adjustments proposed for those years and contained in the statutory notice of deficiency issued with respect to taxable years 1972, 1973, 1974, and 1975. As a result, respondent determined petitioner was ineligible for income averaging for taxable year 1977 as his taxable income for that year did not exceed *258 120 percent of his average base period income within the meaning of section 1302. This adjustment is purely computational and will depend on our decision herein as to petitioner's correct taxable income for taxable years 1973, 1974, and 1975. ULTIMATE FINDINGS OF FACT 1. For the taxable years 1972 and 1975, without regard to any intent to evade tax, respondent failed to prove by clear and convincing evidence any underpayment of tax for either year. Consequently, those years are barred by the statute of limitations. 2. For the taxable years 1973 and 1974, petitioner failed to report gross receipts from his tour boat business in the amounts of at least $3,705.84 and $6,574.74, respectively, thereby understating his income by those amounts, and those understatements of income resulted in an underpayment of tax for each year. 3. For the taxable year 1973, petitioner also failed to report income in the form of dividends of $389.28, dock rental fees of $975, reimbursed business expense of $188.33, and interest of $244.20, which understatements of income resulted in an underpayment of tax for that year. 4. For the taxable year 1974, petitioner also failed to report income *259 in the form of dock rental fees of $1,014, reimbursed business expenses of $232.07, and interest of $905, which understatements of income resulted in an underpayment of tax for that year. 5. All or part of the underpayments of tax for 1973 and 1974 were due to fraud on the part of petitioner. OPINION Normally, the taxpayer has the burden of showing that respondent's deficiency determinations are incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Respondent, however, has the burden of establishing by clear and convincing evidence the elements of the fraud for the section 6653(b) addition. Sec. 7454; Rule 142(b); Stone v. Commissioner,56 T.C. 213, 220 (1971). I Statute of Limitations
Where the normal three-year statute of limitations (sec. 6501(a)) has run, then respondent must prove that the taxpayer's returns were false or fraudulent with the intent to evade tax so that the tax may be assessed "at any time" under section 6501(c)(1). *260 The elements of the fraud under section 6501(c)(1) for limitations purposes are essentially the same as the elements of the fraud under section 6653(b) for the 50 percent civil fraud addition for any "underpayment" of tax "due to fraud." Tomlinson v. Lefkowitz,334 F.2d 262 (5th Cir. 1964), cert. denied 379 U.S. 962 (1965); Estate of Temple v. Commissioner,67 T.C. 143, 159-160 (1976); McGee v. Commissioner,61 T.C. 249, 256-257, 261 (1973), affd. 519 F.2d 1121 (5th Cir. 1975); Amos v. Commissioner,43 T.C. 50, 55 (1964), affd. 360 F.2d 358 (4th Cir. 1965). In the present case, the normal three-year period for assessment of deficiencies expired before respondent issued his statutory notice of deficiency. Absent a showing of fraud, each of the years 1972 through 1975 is barred by the statute of limitations. Fraud is a question of fact to be determined on the basis of the entire record. *261 Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 389 U.S. 912 (1967). Respondent must establish each element of the fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). The elements to be shown are (1) an underpayment of tax, and (2) that some part of this underpayment was due to fraud. Hebrank v. Commissioner,81 T.C. 640, 642 (1983). Respondent need not prove the precise amount of underpayment resulting from fraud, but only that there is some underpayment and that some part of the underpayment is due to fraud. Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court. Respondent must prove fraud in each of the years involved. Drieborg v. Commissioner,225 F.2d 216, 220 (6th Cir. 1955). Where, as in this case, the fraud allegations are inextricably intertwined with and dependent upon the alleged omissions of income, we must be extremely careful not to bootstrap a finding of fraud *262 upon a taxpayer's failure to carry his burden of proof with respect to the deficiency determination. Drieborg v. Commissioner,supra,225 F.2d at 218; Estate of Beck v. Commissioner,56 T.C. 297, 363 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Accordingly, since respondent must prove fraud to lift the bar of the statute of limitations, we need not, and indeed should not, address the correctness of the deficiency determination unless and until we find respondent has carried his burden of establishing fraud, i.e., has established by clear and convincing evidence that there was an "underpayment" of tax and that some part of that underpayment was "due to fraud." Sec. 6653(b). See Hebrank v. Commissioner,supra,81 T.C. at 642; Stone v. Commissioner,supra,56 T.C. at 220. [52]
In this case respondent says that each year petitioner understated his income from his tour boat business and omitted certain *263 other income items such as interest, dividends, and dock rental fees. To put respondent's arguments and petitioner's counter-arguments into proper context, we must first discuss petitioner's purported handling of gross receipts and his so-called Receipts Books. Petitioner ran a tour boat business that generated large amounts of cash receipts. The cash receipts and other receipts (checks, invoices) were usually collected by petitioner or his employees on board the boat and placed in brown paper bags. Those brown paper bags were taken by (or were given to) petitioner at the end of the day or soon thereafter. After the brown paper bags came into petitioner's possession, only petitioner handled the gross receipts and recorded them in his Receipts Books. While several employees knew about the brown paper bags, only petitioner handled the contents of the bags and only petitioner made entries in the Receipts Books. Those Receipts Books, while an unsophisticated record system, appear regular on their face, reflecting two kinds of receipts - snack bar sales and passenger fares. Those Receipts Books reflect daily receipts throughout the April-to-September tour boat season, with breakdowns *264 as to type of tour, numbers of passengers and whether the passengers were adults or children, and sometimes the port where the passengers boarded the boat. Those Receipts Books reflect monthly totals of receipts during the tour boat season, which monthly totals in turn add up to the annual totals. The annual totals reflected on those Receipts Books are the totals reported on petitioner's Schedule C's for the tour boat business. While petitioner insists that the totals of the gross receipts in his Receipts Books and on his tax returns are correct and include all his income for each year, he asks the Court to believe that the daily and monthly entries on these Receipts Books are not what they purport to be. In other words, unlike the usual case, petitioner is really asking the Court to find that his records are totally false in all particulars except for the totals which he insists are totally accurate. Respondent's agents uncovered specific tour receipts from school tours and social tours not shown "as such" on the Receipts Books. At least for 1973 and 1974, these specific school and social tours were well documented by contracts, invoices, and cancelled checks, which documents *265 respondent obtained from the schools and the tour groups, not from petitioner. Such clearly documented tour boat receipts, unlike the cash payments from walk-on passengers for the public tours, could and should have been easily entered and identified in the Receipts Books, but they cannot be found "as such." Petitioner insists these tours are all in the Receipts Books somewhere, but neither he nor anyone else can determine where they are. Respondent's agents also uncovered other items of income not related to the tour boat business and not otherwise reported on petitioner's tax returns. Again petitioner insists that these amounts too are included in his Schedule C gross receipts total figures. Respondent uncovered certain dividends, dock rental fees, and reimbursed business expense items not shown on petitioner's tax returns. While petitioner agrees he received these amounts, [53] he insists that these items too are included in the Receipts Books totals. While these items cannot be found "as such" on his books, petitioner again says they are all in the Receipts Books somewhere, but neither he nor anyone else can determine where they are. *266 Had petitioner simply entered a total figure for each day or even for each month, his story might have been plausible, but there was no reason to reconstruct wholly false records as petitioner says he did (to take totals in bags and work backward to figure out the number of tours and number of adults and children that represented). His story about combining the contents of brown paper bags and not making entries in the Receipts Books for up to six months later (long after the tour season ended) is incredible. Petitioner had to report snack bar receipts for state sales tax purposes each month, and he did so. There was no reason to fabricate passenger numbers: those were not the numbers kept daily for the U.S. Coast Guard in case of an accident; those figures were not shown to the Chamber of Commerce or used in any other way except to purport to show the daily activity of his tour boat business for tax purposes. Most of the school tours occurred early in the season before the busy regular season began; if respondent's agent could obtain exact documentation from the schools as he did, then petitioner too had such accurate information available and simply chose not to use it. Also *267 since the receipt of dividends and dock rental fees did not always coincide with the tour boat season, we simply do not believe these amounts too somehow ended up in the brown paper bags and ended up as part of petitioner's purported reconstruction of tour boat gross receipts. Once the tour boat season ended, the few receipts coming to petitioner could have been readily and accurately accounted for as received. In support of this unusual twist on record keeping, petitioner testified at length about how he made the entries in his Receipts Books. His putative method, if such intentional falsification could be called a method, could only be intended to make it impossible for petitioner or anyone else to determine what was included in or omitted from the gross receipts totals. Petitioner's story was wholly incredible, and the Court did not believe him. We think the only reasonable conclusion is that these Receipts Books are what they purport to be, a record of tour boat receipts (snack bar sales and passenger fares), albeit an incomplete record. Thus, we are satisfied that petitioner *268 in fact understated his gross income in each of the years. However, that alone is not sufficient to establish by clear and convincing evidence that there was an underpayment of tax each year. Because of the method (or indeed lack of method) used by respondent's agents in developing this case, [54] respondent has failed to prove any underpayment of tax for either 1972 or 1975. *269 Unlike the detailed third-party documentation of school and social tours that respondent obtained for 1973 and 1974, the documentation for 1972 consisted solely of reservation sheets prepared by Dolly Haddock. Neither Haddock nor Agent Burgess had any knowledge as to which of these tours in fact took place or were cancelled. While it may be reasonable to assume that many of the scheduled tours took place and should have been identified "as such" in petitioner's 1972 Receipts Book, such an assumption does not rise to the level of clear and convincing evidence. While the Court is troubled by the fact that petitioner did fail to report some small amounts of dividends, interest, and dock rental fees that year that probably resulted in an underpayment of tax, nevertheless the controlling standard of proof is clear and convincing, not a mere preponderance of the evidence. Accordingly, we cannot find an underpayment of tax for 1972. The year 1975 involves an even more egregious lack of proof on respondent's part. Respondent never examined petitioner's 1975 Receipts Book or his other books and records for that year. See nn. 21, 32, 54, supra. Respondent did not obtain any third-party *270 documentation of any omitted tour boat receipts, not even reservation sheets such as were obtained for 1972. Instead respondent used a percentage projection. Respondent increased the gross receipts figure reported on petitioner's 1975 return by 61.76 percent, the average percentage by which respondent had determined from the Ballard summaries that petitioner's receipts had been underreported for the preceding three years. Respondent explained on brief with respect to that year that he determined that "because petitioner had understated his gross receipts by an average of 61.76 percent for the years 1972, 1973, and 1974, over the amounts he reported for said years based upon the information and records that he supplied Mr. Grant Ballard * * * that he must have done the same for 1975." (Emphasis added.) Respondent must prove fraud for each year. Drieborg v. Commissioner,supra.Also fraud is never imputed or presumed. Olinger v. Commissioner,234 F.2d 823, 824 (5th Cir. 1956); Green v. Commissioner,66 T.C. 538, 550 (1976). *271 This type of projection, were it more soundly based, could perhaps satisfy a lesser standard of preponderance of the evidence. However, the projection in this case lacks a sound evidentiary base, has no probative value, and does not constitute clear and convincing evidence of an underpayment of tax for 1975. While the amounts of other omitted income items are substantially larger for 1975 and even more troubling to the Court than those for 1972, the Court cannot conclude, on this record where respondent never examined any of petitioner's books and records for that year, that respondent has established by clear and convincing evidence any underpayment of tax for 1975. For the reasons discussed above and without regard to the intent to evade tax, the Court concludes that since respondent has failed to prove any underpayment of tax for 1972 and 1975, those years are barred by the statute of limitations. We conclude otherwise for 1973 and 1974. Respondent has established by clear and convincing evidence understatements of taxable income that resulted in underpayments of tax for those years. We now turn to the question of whether those underpayments were due to fraud. II *272 Fraud
The fraud envisioned by section 6653(b) is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Candela v. United States,635 F.2d 1272 (7th Cir. 1980); Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Mitchell v. Commissioner,118 F.2d 308 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), followed on remand 45 B.T.A. 822 (1941); Wilson v. Commissioner,76 T.C. 623, 634 (1981), Supplemental Opinion 77 T.C. 324 (1981). Respondent must show that the taxpayer intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent the collection of such taxes. Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 112-113 (1956). *273 Fraud is a question of fact to be determined on the basis of the entire record. Mensik v. Commissioner,supra;Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Otsuki v. Commissioner,supra,53 T.C. at 105-106. Fraud can seldom be established by direct proof of the taxpayer's intention; therefore, the taxpayer's entire course of conduct must be considered, and fraudulent intent can be established by circumstantial evidence. Spies v. United States,317 U.S. 492 (1943); Gajewski v. Commissioner,supra,67 T.C. at 200; Otsuki v. Commissioner,supra,53 T.C. at 105-106. Specifically, we must consider the taxpayer's conduct and other circumstances surrounding the preparation, signing, and filing of the alleged fraudulent returns. Foster v. Commissioner,391 F.2d 727, 733 (4th Cir. 1968). See also Wilson v. Commissioner,supra,76 T.C. at 634. A consistent *274 pattern of underreporting substantial amounts of income over a period of several years is strong evidence of an intent to evade tax. Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962); Brooks v. Commissioner,82 T.C. 413, 431 (1984). While only the years 1973 and 1974 remain open under the statute of limitations, the record in this case establishes for the four years, 1972 through 1975, a pattern of omitting items of taxable income such as interest, dividends, and dock rental fees. These omitted items increased in amount each year. There is also a pattern of omitting gross receipts, and hence understating taxable income, from the tour boat business. The omissions respondent has proved by clear and convincing evidence for 1973 and 1974 are not particularly large compared to the total gross receipts reported for the tour boat business. Nevertheless, we think these omissions are significant in a business that generated largely cash receipts. These omitted tour boat receipts were well documented by contracts, invoices, and cancelled checks that respondent obtained from petitioner's customers (schools and organized tour groups). Needless *275 to say, we did not believe petitioner's story that even these receipts were "in the books" somewhere as part of the cash fares from walk-on passengers. Another factor indicating fraud is petitioner's failure to maintain proper records of his gross receipts. Otsuki v. Commissioner,supra,53 T.C. at 109-110. Petitioner had access to the same documentation of tour boat receipts as his school and tour group customers had, yet he failed to either retain these documents or to use these documents to properly enter the transactions on his Receipts Books. Petitioner's incredible story that everything was somewhere "in the books" even though it could not be found "as such" should be contrasted with the careful, meticulous way in which he maintained records of his expense items. See also n. 55, infra. Moreover, we note the extensive documentation retained by petitioner in support of additional business and travel expenses he claimed at trial for the year 1972. Assuming petitioner had reconstructed his Receipts Books in the manner to which he testified, which we did not *276 believe, that would have involved a prodigious expenditure of time and effort and the Receipts Books thus reconstructed would still be wholly meaningless since one could not find therein even a clearly documented transaction. Suffice it to say, the Court did not believe his tale and regards it as an after-the-fact concoction devised to explain away whatever documented receipts respondent could prove. We think petitioner's Receipts Books are only partial records of what he actually received in his tour boat business and that his failure to maintain proper records of gross receipts is evidence of his intent to evade tax. Another factor indicating fraud, in addition to petitioner's total lack of credibility before this Court, was the misstatements, half-truths, and lies petitioner told Agent Burgess the first day he was interviewed. When asked if he had a safety deposit box, he mentioned one but did not mention the other two he had. When asked if he had any stocks or bonds, petitioner indicated he did not, although he knew he was receiving dividend income. When asked about loans he had *277 made, he mentioned small loans to crew members that were repaid at the end of the week; he did not mention the $20,000 loan to his brother or the $9,500 loan to his son. When asked about rental income, petitioner mentioned only the cinder block buildings; he did not mention dock rentals. When asked about the boats at his dock, petitioner described them as "derelicts" but did not mention that he was receiving dock rental fees from such "derelicts." This pattern of misstatements, half-truths, and lies is persuasive evidence of petitioner's intent to evade tax. Based upon the record as a whole, we conclude that respondent has established fraud by clear and convincing evidence for the years 1973 and 1974. III Deficiencies
Because of respondent's use of the Ballard summaries for 1972, 1973, and 1974 and use of a percentage projection for 1975, petitioner argues that the statutory notice of deficiency was arbitrary, capricious, and clearly excessive, so that the burden of proof should be shifted to respondent. Helvering v. Taylor,293 U.S. 507 (1935); Weimerskirch v. Commissioner,596 F.2d 358 (9th Cir. 1979), *278 revg. 67 T.C. 672 (1977); Llorente v. Commissioner,649 F.2d 152 (2d Cir. 1981), affg. in part and revg. in part 74 T.C. 260 (1980). Respondent, on the other hand, relies upon the presumption of correctness of the notice of deficiency ( Welch v. Helvering,supra) and argues that petitioner is asking the Court to go behind that notice ( Greenberg's Express, Inc. v. Commissioner,62 T.C. 324 (1974)). While the Court agrees that respondent's investigation and trial preparations were grossly deficient in this case (see n. 54, supra), we do not agree that respondent's notice of deficiency was "arbitrary, capricious, wholly excessive, and the product of institutional bad faith," as petitioner contends. It just means respondent failed to carry his heavy burden of proof as to 1972 and 1975. On the other hand, we do not accept the notice of deficiency at face value, as respondent seems to urge. Invocation of the principle that we should not go behind the notice of deficiency does not mean, however, that *279 this Court must shut its eyes to what the record plainly shows, namely, that the notice of deficiency is based upon the Ballard summaries for 1972 through 1974 and upon a mere projection for 1975, and that there is no evidence in the record supporting those figures.[55] We think it unnecessary in this case to explore the full ramifications of the procedural device of the presumption of correctness or the nature of the burdens placed on petitioner (burden of ultimate persuasion and burden of going forward). See Foster v. Commissioner,391 F.2d 727, 734-736 (4th Cir. 1968); Stout v. Commissioner,273 F.2d 345, 350 (4th Cir. 1959). For a thorough commentary on these difficult issues, see Judge Tannenwald's concurring opinion in Llorente v. Commissioner,74 T.C. 260, 272-280 (1980), affd. in part and revd. in part 649 F.2d 152 (2d Cir. 1981). Here we think it unnecessary to talk about presumptions after a lengthy trial, and with voluminous documents in the record. Whatever function the notice of deficiency serves, it has long since served its purpose and dropped out of the picture, as has the presumption of correctness. *280 We would reach the same result in this case whether or not the burden of going forward was shifted to respondent. We decide the case on the record as a whole, which establishes only the amounts of omitted income as set out in our Ultimate Findings of Fact. The amount of the resulting deficiencies for 1973 and 1974 must be determined under Rule 155. *281 IV Income Averaging
The only issue for 1977 is whether petitioner's taxable income that year exceeded 120 percent of his "average base period income" for income averaging purposes. Sec. 1301 et seq. This is purely a computational matter to be determined by the parties in their Rule 155 computations. [56]
*282 To reflect the above holdings, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner has conceded that he is liable for additional investment tax credit recapture in the amount of $270 for the taxable year 1977. Respondent has conceded that petitioner did not receive taxable income in the form of certain "dock rental fees" from Gaskill Printers in the amounts of $3,025 and $25 in taxable years 1973 and 1974, respectively. Petitioner received rental income of $3,000 in 1973 that was reported on his return for that year. This amount is reflected in adjustment E of Joint Exhibit 8-H as the "Less: Amount Reported ($3,000.00) for 1973." Respondent has also conceded that petitioner did not receive taxable income in the form of certain "reimbursed business expenses" in the amount of $6.54 in taxable year 1974. ↩
3. The parties have stipulated herein to the amounts of dock rental fees which petitioner received, such amounts for taxable years 1973, 1974, and 1975 being slightly less than those set out in the notice of deficiency for those years. For the taxable year 1975 the parties stipulated petitioner received dock rental fees of $4,151.30. However, the parties also stipulated that petitioner could have received an additional $20 in cash from Lawrence A. McDowell in dock rental fees during 1975. Thus, we have increased the stipulated amount for 1975 by $20.↩
4. At some point during taxable year 1977, petitioner retired and sold the tour business to Stephen R. Jordan, one of petitioner's employees. Since the only issue herein pertaining to taxable year 1977 concerns petitioner's eligibility for income averaging in that year, it is irrelevant that petitioner did not own the tour boat business for all of taxable year 1977. ↩
5. Petitioner is now married to Dorothy Furbee, but was not married to her during any of the years in issue.↩
6. At trial, petitioner indicated that a lot of school trips did not show up, and his proclaimed general policy of not requiring a deposit from school groups sought to avoid problems associated with refunding such deposits. We note, however, that petitioner's policy as to school groups was not without exception. Certain documentary evidence of record indicates that school groups were sometimes required to post a deposit.↩
7. While a school group could also go on a "public tour," petitioner tried to avoid such an occurrence.↩
8. The record is unclear whether these were also the rates for social cruises during the 1973, 1974, and 1975 tour seasons. Petitioner testified that the prices increased but was not certain whether the prices increased during those years. These rates represent the minimum rates that would have been applicable to social cruises in 1973, 1974, and 1975.↩
9. The parties have introduced as a joint exhibit herein a collection of 227 reservation sheets for school tours and social cruises which were made by and obtained from Haddock for taxable year 1972 and which petitioner estimates to be all of the reservation sheets Haddock prepared that year. However, since persons other than Haddock booked reservations, these sheets do not represent all of the reservations actually made for that year.↩
10. The snack bar receipts were not always placed into a separate bag, but were sometimes commingled in a single bag with the gross receipts from passenger fares. Even when the receipts were commingled, the notation of the amount of snack bar sales was still placed in the bag.↩
11. Petitioner attributed this practice to a deep distrust of banks imparted to him by living through the Great Depression. However, the Court did not accept this explanation in view of petitioner's various transactions with banks and other financial institutions.↩
12. Portions of petitioner's testimony suggested that he attempted to keep the gross receipts from passenger fares segregated into a separate bag on a monthly basis. However, petitioner further testified that what purported to be a bag for one particular month could contain the receipts from a different month or several different months.↩
13. With regard to school tours, petitioner's Receipts Books sometimes do not list a school by name specifically, but only designate that the charter is for a school and the general location thereof, i.e., "Norfolk school." Inclusive of the $600 down payment. [1]4 At trial, petitioner testified that the amount entered under a particular group's name did not necessarily represent the amount which the group had actually paid. In explaining this answer, petitioner stated that "if I had their name on the book and no amount on it, if I remembered on it, I would put down a figure that I thought was right. If I didn't remember anything on it, then I would put the minimum, what it would have -- would have had to been a minimum on it." [1]5 On certain entries, petitioner has failed to make a corresponding entry on the right-hand side of the page, but has nonetheless stipulated that he in fact received at least all items of gross receipts listed on the left-hand side in his Receipts Books for the years in issue. This omission is most likely due to the fact that petitioner often allowed groups to charge their cruises, making payment therefor at a time subsequent to the date of the cruise, which petitioner inadvertently failed to reflect in the right-hand column at the appropriate point in his Receipts Book.↩
16. The number of time slots listed varied over the course of a particular tour season, but formed a pattern which remained fairly constant for each of the taxable years in issue. During approximately the first half of the tour season, the time slots listed generally corresponded with the various public tours offered during that particular portion of the tour season. However, during the latter half of the tour season the pages are not broken down in this manner, generally providing only a single listing for daytime public tours and a separate listing for evening public tours. [1]7 As was true with the time slots discussed above, the number of fares were usually broken down by the loading port during approximately the first half of the season, but not during the second half.↩
18. As detailed above, petitioner's Receipts Books appear regular on their face and appear to be what they purport to be, a daily record of his tour boat business. Petitioner, in explaining how he maintained the Receipts Books, in effect asks the Court to find that everything in these books is false except the annual total figures. Petitioner's testimony was inherently incredible, and the Court did not believe him. However, we set out his testimony in detail to show, among other things, the vast amount of work that would have been involved in creating the inherently meaningless and false records he says he created.↩
19. Petitioner stated that he kept no records of the number of trips cancelled due to weather. We note, however, that notations of the weather or of a mechanical breakdown appear at various locations in petitioner's Receipts Book. ↩
20. As an apparent explanation of his motives in attempting to break the amounts treated as passenger fares down into adult, child, and sunset cruise fares, petitioner vaguely suggested that he did so to somehow appease the local Chamber of Commerce. However his Receipts Books were never shown to the local Chamber of Commerce or used for advertising or for any other purpose except purportedly to show the daily, monthly, and annual gross receipts of his tour boat business for tax purposes.↩
21. Other than his Receipts Book for taxable year 1975, no other business records pertaining to that year have been introduced into evidence herein. Petitioner indicated that he had brought such records with him to trial pursuant to a Government subpoena, but neither party offered any of those records into evidence.↩
22. The figures were first given to Ballard orally, and the notebooks were then presented to allow Ballard to make written copies of the summary pages contained therein. ↩
23. Respondent's suggestion on brief that the notebooks shown to Ballard represented a secret second set of records maintained by petitioner does not have a sufficient factual basis in the record. While it is true that Ballard could not identify petitioner's Receipts Books as the notebooks he was given during the meeting, as suggested by petitioner, it is clear from the record that his inability is based solely upon the absence of the Summary pages therefrom, which petitioner stated were torn out and thrown away after the sale negotiations ended.↩
24. We note that the schedule prepared by Ballard from the Summary pages does contain a notation of the amount of gross receipts per Schedule C for taxable years 1973 and 1974, but Ballard stated he did not copy any information from the Schedule C's, and the ink used in making such notations appears different upon visual inspection. Further, it is clear that Ballard could not have made the notations pertaining to taxable year 1974, as he did not examine any portion of that year's return during the meeting with petitioner. It is not clear when such notations were made or by whom they were made.↩
25. Ballard subsequently advised the Whartons not to buy the tour business but, if they chose to do so, advised them to base the purchase price on the fair market value of the boat itself plus some additional payment respecting the net income of the business as reported on the Schedule C's, rather than the larger figures listed on the Summary pages. Ballard indicated his advice was based on a more conservative viewpoint which allowed for losses and did not provide for uncorroborated profits, plus his recognition of the fact that such figures on the Summary pages were possibly "puffed" to some extent. In any event, the extent to which Ballard believed the Summary pages to be correct or "puffed" is irrelevant to any issue in this case.↩
26. Taxable year 1975 was apparently beyond the scope of the original investigation which was subsequently expanded to include that year as well.↩
27. Petitioner testified at trial that he did not understand at this initial meeting that Agent Burgess was conducting a criminal investigation of his taxes. He further testified that only subsequent to this initial meeting did he discover the criminal nature of the investigation from talking to an unnamed attorney aboard one of his cruises. The Court did not believe his testimony, but it is clear that shortly after the initial meeting, which was friendly and cordial, there was a marked change in petitioner's attitude and behavior toward Agent Burgess.↩
28. With regard to savings certificates and cash on hand, the evidence shows that petitioner purchased two savings certificates and two certificates of deposit totaling $16,000 during taxable year 1973, one savings certificate and one certificate of deposit totaling $5,374.67 during taxable year 1974, all of which petitioner still had as of December 31, 1975. Petitioner claims that these amounts were "rollovers" from previous savings certificates or certificates of deposit, but offered no evidence in support thereof. The evidence also shows that petitioner paid $6,040 cash for a boat and $1,429 cash for a trailer, both of which were purchased during taxable year 1974.↩
29. Agent Burgess took these records back to his office where they were subsequently photocopied. On May 6, 1976, petitioner telephoned Agent Burgess and requested the return of the records. When Agent Burgess attempted to arrange a return date within a few days at a more convenient time, petitioner demanded that the records be returned that day, and Agent Burgess complied. Petitioner's explanation for this behavior is that he had just learned of the nature of the investigation and Agent Burgess' duties, a claim which we have heretofore rejected. See n. 27, supra.↩
30. Indeed, petitioner and his representatives have at no time produced any documents of this type.↩
31. Petitioner's testimony about this meeting differs drastically from Agent Burgess', petitioner claiming that the entire meeting lasted only five minutes, and stating that he only showed Agent Burgess one page in the book to illustrate the "double-entry" system he used to report certain amounts and also to indicate that certain figures listed in the book were not "money figures," but only "information figures." Considering the record as a whole and the credibility of the witnesses involved, we are satisfied that Agent Burgess' account more accurately reflects the events of the second meeting on April 20, 1976, and accordingly we accept most of his testimony on this point herein. However, Agent Burgess also testified that petitioner stated that the gross receipts figures for public tours listed on the monthly summaries discussed earlier herein, supra, were arrived at by multiplying the total number of passengers listed by the applicable rate, in contradiction to petitioner's claims that the number of passengers listed over the pages for a particular month was a product of dividing the total gross receipts for the month into the appropriate number of adult, child, and sunset cruise fares necessary to produce the total gross receipts figure. While we do not accept petitioner's explanation, we cannot accept Agent Burgess' testimony on this particular point as accurate either, since it appears that his testimony in this regard reflects Agent Burgess' interpretation of certain statements petitioner made concerning how you could determine the rates↩ charged for passenger fares on the various cruises, Agent Burgess candidly admitting at trial that he did not really know how the gross receipts purportedly attributable to public tours were reported on the Receipts Book(s). However, our failure to accept Agent Burgess' testimony on this particular matter is in no way intended to impugn his other testimony herein, which we found highly credible and worthy of belief.
32. Agent Burgess was never in possession of petitioner's Receipts Book for the taxable year 1975.↩
33. For obvious practical reasons, no attempt was made to corroborate amounts reported as public tours or snack bar sales (since there was no way to contact such persons), and Agent Burgess acknowledged as much at trial. ↩
34. Agent Burgess has, with respect to some of the amounts listed by a specific group as "identified," given petitioner the benefit of the doubt by also including in such amount the snack bar sales figures listed for the particular day the private tour occurred.↩
35. Agent Burgess' testimony as set out above was admitted into evidence for the limited purpose of illustrating the steps taken in arriving at the unreported gross receipts figure for taxable year 1972. It is clear from the record that this specific determination is solely an approximation based on the information gleaned from certain of the reservation sheets, as to which there has been no substantive evidence introduced which would indicate that any tours listed on the reservation sheets included in Burgess' computation actually occurred.↩
36. The record does not establish which books Ballard was shown. If he was shown the Receipts Books which are in evidence, those books would not add up to the gross receipts figures Ballard copied from the Summary pages (See n. 23, supra↩) and would tend to support petitioner's claim that the Ballard figures were "puffed" projections for negotiation purposes. On the other hand, if Ballard had been shown a different set of Receipts Books, that would tend to support respondent's theory of a secret second set of books maintained by petitioner. The record simply does not provide an answer to this intriguing mystery.
37. United States v. Walter M. McDowell,↩ No. CR 79-49-N (E.D. Va. 1979). 38. The parties have entered into extensive stipulations in this case (over respondent's reserved objection as to materiality and relevancy) concerning the conduct of the criminal trial, evidence considered therein, and certain statements made by the presiding judge in announcing the decision of acquittal. While the ultimate fact of petitioner's acquittal of violating section 7206(1) for taxable years 1973 and 1974 is a factor to be considered with respect to those taxable years raised in this proceeding, the remaining facts relating to the earlier criminal trial and set out in the stipulation of facts submitted by the parties do not deserve similar attention. It is clear we must decide the instant civil tax proceeding on its own merits based upon the evidence presented herein, not on the trial of the earlier criminal case. Further, petitioner's strained argument that his earlier acquittal serves to collaterally estop respondent with respect to the civil fraud issue raised herein for the same taxable years involved in the criminal proceeding is devoid of merit. Neaderland v. Commissioner,424 F.2d 639 (2d Cir. 1970), affg. 52 T.C. 532 (1969), cert. denied 400 U.S. 827↩ (1970).
39. As with the criminal trial, the parties have submitted extensive stipulations of fact (over respondent's reserved objections as to materiality and relevancy) concerning various events and statements made by persons involved in the decision to proceed civilly against petitioner. Except in rare and unusual circumstances not presented herein, this Court will not look behind the statutory notice of deficiency to examine the evidence used, the propriety of respondent's motives, the administrative policy or procedure followed in making the determination. Riland v. Commissioner,79 T.C. 185 (1982); Greenberg's Express, Inc. v. Commissioner,62 T.C. 324 (1974). A trial before this Court is a de novo proceeding, and our determination of a taxpayer's tax liability must be based on the merits of the case and not on any previous record developed at the administrative level. Greenberg's Express, Inc. v. Commissioner,supra;O'Dwyer v. Commissioner,28 T.C. 698 (1957), affd. 266 F.2d 575 (4th Cir. 1959), cert. denied 361 U.S. 862↩ (1959).
40. On brief, respondent offers the following explanation of this adjustment: "With respect to the year 1975, respondent determined that because petitioner had understated his gross receipts by an average of 61.76 percent for the years 1972, 1973, and 1974, over the amounts he reported for said years based upon the information and records that he supplied Mr. Grant Ballard as set forth above, that he must have done the same for 1975."↩
*. Petitioner purchased 200 shares of Virginia Electric and Power Company stock on or about October 8, 1974, for a total of $1,778.63, of which $1,700 was in the form of a cashier's check drawn on the Bank of Virginia dated October 10, 1974. * The parties have stipulated that the amount listed as "dock rental fees" from petitioner's brother, Lawrence A. McDowell, represented payment for "electricity and water." While the record is unclear, Lawrence A. McDowell apparently did not moor a boat at the docks, but just made use of the utility services available there. Further, the parties have stipulated that the actual "dock rental" figure for taxable year 1975 could have been approximately $20 higher than stated. ** Including reimbursement for electricity.↩
41. Respondent suggests that these entries were made after the fact in support of petitioner's claims herein. We note that the total gross receipts reported in petitioner's 1975 Receipts Book, inclusive of the $2,190 stated to represent dock rentals for that year, reconcile with the total amount of gross receipts from the tour business petitioner reported on the Schedule C attached to his 1975 return. However, we also note that while the return indicates it was signed by petitioner on April 12, 1976, prior to the first contact with petitioner on April 20 of that year concerning the investigation of his tax liabilities for certain of the years in issue, the 1975 return was not actually received by the Internal Revenue Service until September 8, 1976 (apparently pursuant to an extension of time in which to file), by which time petitioner was aware of the question concerning the dock rental fees. ↩
42. The amount of dividends reported on petitioner's 1974 return is slightly in excess of the amount of dividends which the parties have stipulated to for that year. We note that no increase in income attributable to unreported dividends is proposed for taxable year 1974 in the notice of deficiency.↩
43. At trial, both petitioner and his counsel tried to explain away petitioner's answers to the above questions, asserting that petitioner had misunderstood what he was being asked or else he did not properly hear the questions. Petitioner's counsel's comments are not evidence and cannot be considered. With regard to petitioner's testimony on this point, we note that the questions Agent Burgess asked petitioner were of themselves straightforward and not readily subject to misinterpretation. Further, at trial petitioner did not display any difficulty in answering the questions he wanted to answer. We do not believe petitioner's self-serving claims that he misunderstood the questions asked of him during the initial meeting on April 20, 1976.↩
44. The meeting grew out of a contact Agent Burgess had with petitioner on May 12, 1976, during which petitioner was given a letter outlining certain areas which Agent Burgess wished to discuss with him.↩
45. Jordan indicated, however, that the dock rentals were not put into a bag if collected during a month in which there were no tours, such as before or after the tour season for a particular taxable year, and accordingly for which there would have been no bags maintained aboard the boat. While Jordan did not indicate what happened to such dock rentals, we assume they were ultimately turned over to petitioner, who claims they were then placed in a bag. Petitioner testified that all dock rentals were placed in the brown paper bags, but the Court did not believe his testimony.↩
46. Petitioner and his counsel again tried to explain away petitioner's answers, claiming he had misunderstood Burgess' questions. For reasons expressed earlier herein, we do not believe petitioner's explanation. See nn. 27, 43, supra.↩
47. The loan was made in the form of four separate cashier's checks, the funds to purchase which petitioner claimed to have come from money previously deposited in the safety deposit boxes or kept in his safe, denying that any such amounts derived from unreported gross receipts of the tour boat business withdrawn from the bags stored at petitioner's home. Two of the cashier's checks were drawn on Citizen's Trust Bank in the face amount of $4,900 each. The entry records for a safety deposit box petitioner maintained there indicate that petitioner visited the safety deposit box on May 20, 1974, the date of the loan to his brother. The third cashier's check was drawn on the Bank of Virginia in the face amount of $5,000. The entry records for the safety deposit box petitioner maintained there do not indicate that petitioner visited the safety deposit box on or near the date of the loan. The fourth cashier's check is drawn on American Fidelity Bank in the face amount of $4,900. The record does not indicate petitioner had any type of account or safety deposit box at this bank.↩
48. While he did not testify at trial, Lawrence was interviewed by Agent Burgess as to the details of the loan during his investigation. On cross-examination, petitioner's counsel elicited a body of testimony from Agent Burgess concerning statements Lawrence had made regarding the loan, particularly whether it was interest-free or not. Respondent also introduced into evidence an unsigned document which the parties have stipulated was identified by Lawrence as embodying his understanding of the loan transaction, such document providing for the payment of interest. The record suggests that Agent Burgess in fact prepared this document and that it was not actually part of the loan transaction between petitioner and his brother. Since Lawrence did not testify at trial, it is clear that any statements he may have made to Agent Burgess with regard to whether the loan was interest-free or not constitute hearsay. The Court will rely only upon the parties' stipulation that the document (regardless of who prepared it) embodied Lawrence's understanding of the loan transaction.↩
49. The record does indicate, however, and petitioner does not deny, that he did subsequently receive a substantial interest payment with respect to this loan upon the lump-sum repayment thereof in a year subsequent to those before the Court, petitioner claiming to have reported such interest as income for that year. Petitioner asserted that the payment of such interest was of Lawrence's own volition, and not pursuant to the terms of their original loan agreement. See n. 48, supra.↩
2. Petitioner's payment record lists a closing balance of $36.35, bringing the total amount of principal to $9,500, the sales price. It is not clear whether petitioner subsequently received this amount.↩
50. At trial, petitioner's counsel attempted to question Agent Burgess concerning the respective amounts attributable to Consolidated and Coca-Cola. While Agent Burgess acknowledged that the subject of unclaimed business expenses was mentioned during the May 24, 1976 meeting, it is clear from the record that petitioner's counsel had the wrong witness on the stand. Agent Burgess was involved in the criminal investigation; the revenue agent handled the matters involving the adjustments in the notice of deficiency.↩
51. This total figure represents five times the individual passenger fare, and it appears there was another person's fare (possibly petitioner's) included in this total amount other than petitioner's two daughters, Jordan, and Johnson.↩
52. See Mosteller v. Commissioner,T.C. Memo. 1986-505↩.
53. Respondent also uncovered interest income not reported on petitioner's tax returns. Petitioner denies that he received such interest payments from his son and his brother, but the Court is satisfied that he did.↩
54. The only investigation in this case appears to have been that conducted by Agent Burgess for the criminal case, but a charge under section 7206(1) requires neither proof of an underpayment nor proof of intent to evade tax. Wright v. Commissioner,84 T.C. 636 (1985). Even so, the record for the two years involved in the criminal case (1973 and 1974) is more complete than that for the other years. Agent Burgess obtained a few documents (reservation sheets) in regard to 1972, but that year was not part of the criminal case and the facts were never fully developed. The year 1975 apparently was never involved in Agent Burgess' investigation, and he never saw petitioner's Receipts Book or any other books and records for that year. It appears that respondent never examined petitioner's 1975 records even in connection with the trial in this Court. Following petitioner's acquittal of the charges under section 7206(1)↩, this civil tax proceeding was instituted and was expanded to cover all four years. If any further investigation was conducted at any time before the trial, it is not apparent to this Court. The statutory notice of deficiency simply used the figures from the Ballard summaries for the years 1972, 1973, and 1974 and used a percentage projection for 1975. That was essentially the approach taken by respondent's counsel at trial and on brief. Despite the lengthy trial and voluminous documentary evidence, the record before this Court is largely a rehash of Agent Burgess' investigation. There are bits and pieces of data such as petitioner's cash expenditures but without any proof that the source of such funds was the current year's income. This case would have benefited from proper investigation for the civil tax proceeding and use of some recognized method of reconstructing income such as the net worth method or source and application of funds. Some such consistent approach would have either produced a better record or perhaps resulted in a settlement for at least some of the years. We recognize that settlement is difficult in a fraud case where the taxpayer's credibility is in issue. Nevertheless, settlement possibilities would have been enhanced if respondent had not chosen to take such an extreme position and if respondent had evaluated the strength of his evidence more realistically.
55. While respondent hinted that petitioner kept a secret second set of books, there was no proof of that except for the summaries CPA Grant Ballard copied from petitioner's books in connection with a proposed sale of the tour boat business in August of 1974. Petitioner destroyed those summaries when the sale fell through, so the Court cannot determine what, if anything, they represented. While petitioner insisted at trial these summaries were just projections he made and simply "puffed" figures for sales negotiation purposes, we found it striking that the expense figures Ballard copied from petitioner's summaries exactly matched the expense figures on petitioner's books in evidence and as reported on his tax returns for 1972 and 1973. However, we decline to engage in speculation beyond that one observation about the expense figures.↩
56. At first blush, there may appear to be a problem for 1975. Since respondent failed to prove fraud that year, we did not reach the issue of the correctness of petitioner's taxable income for that year. However, in determining petitioner's average base period income for purposes of the income averaging provisions, it is irrelevant that assessment and collection of any tax in any base period year is barred by the statute of limitations. The income to be used in each base period year is the correct taxable income for such year, not the taxable income as reported ( Unser v. Commissioner,59 T.C. 528 (1973)), and the burden of proving the correctness of the base period income is on petitioner. See also Venditti v. Commissioner,T.C. Memo. 1981-390; Abernathy v. Commissioner,T.C. Memo. 1978-370↩. However, rather than hold that petitioner has failed to prove his correct taxable income for 1975, the Court would determine the income for that year by increasing his reported income by $499.58 in unreported dividends ($691.58 total dividends received less $192 reported on his 1975 return), by $1,981.30 in unreported dock rentals ($4,171.30 received less $2,190 reported on his 1975 return), and by $1,780.20 in unreported interest income.