CHRIS G. ALEVRAS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Alevras v. Commissioner
Docket No. 18404-81.
United States Tax Court
T.C. Memo 1987-497; 1987 Tax Ct. Memo LEXIS 493; 54 T.C.M. (CCH) 735; T.C.M. (RIA) 87497; September 28, 1987. Chris G. Alveras, pro se. Alfred A. Pierri, for respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the taxable year 1977 in the amount of $ 54,184 and a section 6653(b) [1] addition to the tax in the amount of $ 27,092. The issues for decision are as follows: (1) Whether petitioner had unreported income from a check-stealing scheme and, if so, the amount thereof; (2) Whether petitioner had unreported interest income; (3) Whether petitioner is entitled to a deduction for employee business *494 expenses in excess of the amount allowed by respondent; and (4) Whether petitioner is liable for the addition to tax under section 6653(b) for fraud. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The first and second stipulations of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner Chris G. Alevras was incarcerated at the Arthur Kill Correctional Facility, 2911 Arthur Kill Road (A-8), Staten Island, New York, at the time he filed his petition in this case. [2] Petitioner and his wife, Shirley C. Alevras, filed a joint Federal income tax return (Form 1040) for the taxable year 1977 with the Internal Revenue Service Center at Holtsville, New York. [3]
*495 Petitioner received a bachelor of science degree in business administration, with a major in accounting, from the Seton Hall University School of Business on May 23, 1970. In the summer of 1970, petitioner enrolled in graduate school at Seton Hall. He received an MBA degree in finance from the Seton Hall University Graduate Division on December 20, 1975. In September of 1973, petitioner had enrolled in law school at Seton Hall. He was attending law school in 1976 and 1977, during the period pertinent to this case, and received a juris doctor degree from the Seton Hall University School of Law in or about May of 1978. [4]
From December of 1975 to sometime after April of 1977, petitioner was employed by Touche Ross & Co., a certified public accounting firm, as a management consultant. During 1977 petitioner also worked for Foodways National, Inc., and operated his own accounting and tax service. His wife Shirley was a school teacher. In or around December of 1976, Touche Ross signed petitioner to work with the New York City Finance Administration. Touche Ross had been hired by the city of New *496 York to set up an Integrated Financial Management System (IFMS). Petitioner's job essentially involved assisting the city in changing over from a manual to a computerized system of payroll and other check disbursements. While on this assignment, petitioner had access to various checks maintained in the custody of the New York City Finance Administration. These checks had been issued by the city to various payees who had sold goods to or performed services for the city, but for one reason or another had not been delivered to the payees. Some of these checks had been returned to the city by the post office as undeliverable, but others had simply been held up due to ongoing litigation between the payee and the city. Petitioner devised a scheme for stealing these checks from the Finance Administration of the city of New York and converting them into cash. To implement his scheme, petitioner solicited the help of his long-time friend, Anthony Alfaro. Anthony Alfaro (hereinafter Alfaro) and petitioner had known each other since 1966. They first met at Seton Hall when they attended college together and were in the same fraternity. After college they continued to stay in touch with *497 one another. Alfaro was the best man in petitioner's wedding and was also a friend of petitioner's wife and later a friend of his daughter. Petitioner prepared Alfaro's tax returns for the taxable years 1970 through 1976, and he also occasionally prepared income tax returns for Alfaro's parents. During 1976, Alfaro made several trips to the New York City area to visit family and friends and to seek employment in that area. At that time, Alfaro was a salesman with Rudco Industries, selling checks and financial forms to banks. He was then working out of Akron, Ohio and was living in Canton, Ohio. Prior to that he had been working in the New York City area. In the latter part of 1976, petitioner attempted to obtain employment for Alfaro with Touche Ross. Petitioner submitted Alfaro's name to one of his supervisors and Alfaro followed up and submitted a resume. Alfaro had a couple of interviews with Touche Ross but was never hired. During one of Alfaro's then frequent trips to New York, petitioner approached Alfaro and proposed a scheme to steal checks from the New York City Finance Administration. Petitioner described to Alfaro what he perceived as an inadequate security *498 system with respect to certain checks in the custody of the Finance Administration. Petitioner and Alfaro discussed the check-stealing scheme on several occasions before implementing it. From December of 1976 through April of 1977, petitioner stole approximately 33 checks from the New York City Finance Administrating totaling in excess of $ 172,000. Of that amount, checks totaling $ 11,600 were negotiated, cashed or deposited by petitioner and Alfaro during 1976 and checks totaling $ 135,892.28 were negotiated, cashed or deposited by petitioner and Alfaro during 1977. The remainder of the stolen checks were recovered by the authorities before they had been deposited or converted to cash. The initial checks stolen by petitioner were made payable to an individual named Isaac Silverman. Isaac Silverman had been a contractor for the city of New York. However, he and the city were involved in litigation, and these checks had not been delivered to him. On one of Alfaro's visits to New York in the latter part of 1976, around Christmas time, petitioner showed Alfaro these checks he had stolen. The next morning petitioner and Alfaro attempted to deposit or cash these checks at a commercial *499 bank in New York. Petitioner and Alfaro had obtained from various novelty shops a phony social security card and a record club identification card bearing the name of Isaac Silverman. Using those cards as identification, Alfaro attempted to open an account in the name of Isaac Silverman at the Chase Manhattan Bank. Petitioner had returned to work at the Finance Administration and did not accompany Alfaro to the bank. Alfaro was unsuccessful because the bank required extensive identification, including a driver's license, something Alfaro did not have. Alfaro left the bank and telephoned petitioner at work to inform him of the unsuccessful effort to open the account. Petitioner and Alfaro met that evening to discuss and iron out the flaws in their scheme. They decided that a driver's license for Isaac Silverman was obviously needed. In the next day or so, Alfaro met petitioner at petitioner's house and the two of them drove to the motor vehicle office in Elizabeth, New Jersey. While petitioner waited outside, Alfaro went in and filled out a driver's license application claiming to be Isaac Silverman, using a street address in East Orange, New Jersey, an area where he had once *500 lived. Alfaro was subsequently issued a New Jersey driver's permit in the name of Isaac Silverman. With the identification for Isaac Silverman that petitioner and Alfaro had gathered, including the driver's permit, Alfaro opened a savings account at the New York Bank for Savings in the name of Isaac Silverman. Alfaro deposited into this account a check made payable to Isaac Silverman that petitioner had stolen from the New York City Finance Administration. During December of 1976, two checks stolen by petitioner totaling $ 10,200 were deposited into this account by Alfaro. Approximately eight days after the initial deposit, petitioner and Alfaro made the first withdrawal from this account. With petitioner waiting outside the bank, Alfaro withdrew $ 600 from this account. Alfaro left the bank with petitioner following close behind. They went into a restaurant or bar where Alfaro handed over the $ 600 to petitioner. Petitioner kept half of the money and gave Alfaro the other half and the two friends went their separate ways. In withdrawing the $ 600 from the account at the New York Bank for Savings, Alfaro noticed that the teller had to get an officer of the bank to initial *501 the withdrawal. Because of suspicions created over large withdrawals of cash, especially at that particular bank, petitioner and Alfaro revised their scheme of converting the stolen checks into cash. In late December of 1976, Alfaro, using the same false identification he used to open the account at the New York Bank for Savings, opened another account in the name of Isaac Silverman at the Union Dime Savings Bank in New York City. The following is a schedule of the checks that were stolen by petitioner from the New York City Finance Administration and deposited or cashed by Alfaro at the Union Dime Savings Bank during 1977: [5]
Amount
Amount
Cash to
Date
of Checks
Deposited
Petitioner/Alfaro
1/07/77
$ 8,588.31
$ 7,388.31
$ 1,200.00
1/24/77
1,180.00
660.00
1,200.00
1/24/77
680.00
2/18/77
17,560.00
17,560.00
3/01/77
590.00
1,220.00
3/01/77
630.00
3/03/77
6,646.22
11,646.22
3/03/77
5,000.00
3/14/77
9,724.42
9,899.42
3/14/77
175.00
3/22/77
80.00
200.00
120.00
3/22/77
15,639.65
15,639.65
3/31/77
23,275.06
23,275.06
4/08/77
10,001.85
10,001.85
4/08/77
4,460.00
4,460.00
4/18/77
280.00
31,541.77
4/18/77
350.00
4/18/77
1,000.00
4/18/77
250.00
4/18/77
436.38
4/18/77
29,225.39
Total
$ 135,892.28
$ 133,492.28
$ 2,400.00
*502 Some of the checks making up the above deposits were not payable to Isaac Silverman. For those checks, petitioner or occasionally Alfaro forged the payee's name and usually Alfaro forged Isaac Silverman's further endorsement. Petitioner and Alfaro always worked together in forging the various endorsements. Alfaro then deposited the checks into the Isaac Silverman account. During 1977 petitioner and Alfaro received a total of $ 104,415.58 in connection with the fictitious Isaac Silverman account at the Union Dime Savings Bank calculated as follows: Account balance at
end of 1976
$ 1,401.00
Total deposits
during 1977
133,492.28
Plus cash received at
time of deposit
2,400.00
Plus interest credited on
account during 1977
120.32
$ 137,413.60
Less balance at time of
32,998.02
apprehension
Withdrawals during 1977
$ 104,415.58
In addition to the $ 2,400 in cash received at the time of making certain deposits, *503 petitioner and Alfaro made several cash withdrawals totaling $ 3,960 from the Union Dime Savings Bank account between January 27th and April 18th of 1977. The other withdrawals during that period were made by teller checks that were used to purchase Krugerrands in the name of Isaac Silverman from a coin company called Manfra, Tordella & Brookes, Inc. Petitioner devised this arrangement in order to facilitate large withdrawals from this account and to avoid the suspicion that large cash withdrawals would create. The following is a schedule of the purchases of Krugerrands made by petitioner and Alfaro using proceeds from the checks stolen by petitioner and deposited into the Isaac Silverman account at the Union Dime Savings Bank during 1977: [6]
No. of
Krugerrands
Unit
Sales
Method of
Date
Purchased
Price
Price
Tax
Postage
Total
Payment
2/02/77
42
$ 140.50
$ 5,901.00
$ 472.08
-
$ 6.373.08 Teller's
Check
Union
Dime
Bank
3/04/77
110
149.00
16,390.00
-
$ 25.00
16,415.00 Teller's
Check
Union
Dime
Bank
3/11/77
80
152.50
12,200.00
-
20.00
12,220.00 Teller's
Check
Union
Dime
Bank
3/22/77
70
158.00
11,060.00
-
20.00
11,080.00 Teller's
Check
Union
Dime
Bank
3/31/77
100
157.25
15,725.00
-
20.00
15,745.00 Teller's
Check
Union
Dime
Bank
4/08/77
120
156.00
18,720.00
-
20.00
18,740.00 Teller's
Check
Union
Dime
Bank
4/13/77
110
158.75
17,462.50
-
20.00
17,482.50 Teller's
Check
Union
Dime
Bank
632
$ 153.00 (average unit price)
$ 98,055.58
*504 Prior to making each of those purchases, either petitioner or Alfaro called the coin dealer, Manfra, Tordella & Brookes, to obtain a price quotation for Krugerrands for that specific day. Petitioner and Alfaro estimated the amount of money available for withdrawal in the Isaac Silverman account at the Union Dime Savings Bank based on the deposited checks that had cleared by that time. Alfaro called the dealer and ordered the appropriate number of Krugerrands that coincided with the available money in the account. Alfaro then went to the Union Dime Savings Bank and had the bank draw a teller check on the Isaac Silverman account payable to Manfra, Torrdella & Brookes for the total purchase price of the Krugerrands he had ordered. Alfaro then took the teller check to the coin dealer where he purchased *505 the coins in the name of Isaac Silverman. On the first two purchases, [7] Alfaro actually picked up the Krugerrands from Manfra, Tordella & Brookes at its New York office. On each of those purchases Alfaro used as the address for Isaac Silverman 32 South Munn Avenue, East Orange, New Jersey, the same address he used in obtaining the false driver's permit. The clerk at Manfra, Tordella & Brookes, however, suggested having the Krugerrands mailed to New Jersey to avoid the eight-percent sales tax imposed on purchased picked up at the New York office. Petitioner and Alfaro decided to heed this advice to avoid suspicion, and Alfaro subsequently leased a furnished apartment located at 60 South Munn Avenue, Apartment 1014, East Orange, New Jersey, to use as the mailing address for the Krugerrands. Thereafter, petitioner and Alfaro received Krugerrands at that address on six different occasions during 1977. Actually, the Krugerrands were sent by registered mail, and the postman simply left a notice of an attempted delivery at the leased apartment. After three or four days had passed from the mailing date, Alfaro picked up the notice at the apartment and went to the East Orange Post Office *506 and picked up the coins. On each occasion after Alfaro had the Krugerrands in his possession, he called petitioner at work to inform him he had made the pickup. However, Alfaro always used code names for the Krugerrands such as shirts, cigars or socks in case someone else was listening on the extension. Alfaro and petitioner always met that same evening at petitioner's house, at which time Alfaro gave petitioner the Krugerrands. On some occasions, Alfaro made cash withdrawals from the Isaac Silverman account at the Union Dime Savings Bank at the same time he had the teller checks drawn for the Krugerrands. Petitioner and Alfaro always split the cash withdrawals equally. In addition, petitioner always checked the deposit slips, the savings account passbook and the withdrawals to make sure the deposits and withdrawals coincided with the amounts on the checks he had stolen and given to Alfaro. After petitioner had stolen the checks, every step of the check-stealing scheme was implemented and carried out in the name of Isaac Silverman. *507 Alfaro, posing as Isaac Silverman, made all the check deposits and withdrawals, ordered the Krugerrands from the coin dealer, leased the apartment in East Orange, New Jersey to facilitate the mailing of the Krugerrands, and physically picked up all the Krugerrands purchased with the stolen proceeds. However, after petitioner received the Krugerrands from Alfaro, he acquired and maintained a complete dominion and control over the Krugerrands and any cash derived therefrom. Petitioner told Alfaro that his (petitioner's) next-door neighbor, who had some connection with the jewelry business, was selling the Krugerrands a few at a time. Whenever Alfaro questioned petitioner as to the status of the Krugerrands, petitioner was very evasive and never gave him a straightforward answer. Petitioner never told Alfaro how many Krugerrands had been sold and how much cash was available from the sales. During 1976 and 1977, Alfaro actually received only $ 15,000 from the check-stealing scheme he engaged in with petitioner. This figure includes the amounts he received from cash withdrawals, the $ 3,500 he received from petitioner that he used as a down payment in purchasing a car, the amount *508 petitioner paid for Alfaro's wedding reception, and other cash he received from petitioner from time to time. On April 27, 1977, petitioner and Alfaro met at the corner of 39th Street and Broadway went into a nearby coffee shop, as they had done on numerous prior occasions, to go through their normal routine of forging endorsements on more stolen checks. Alfaro and petitioner prepared the checks for deposit, obtained a price quote for Krugerrands for that day and determined the amount available for withdrawal in the Isaac Silverman account, at the Union Dime Savings Bank. Alfaro apparently placed an order with Manfra, Tordella & Brookes for 190 Krugerrands at $ 29,212.50. [8] Alfaro proceeded to the Union Dime Savings Bank to make the necessary deposits and withdrawals. When he entered the bank, he was approached by Officer Miley, who identified himself as a New York City detective, and placed Alfaro under arrest. Alfaro told Officer Miley about petitioner's role in the scheme. Petitioner surrendered himself to Assistant District Attorney Justin Tobia the next day, April 28, 1977, at which time he was placed under arrest. Petitioner was read his constitutional rights and was not *509 questioned until later that day after his attorney had arrived. Later that same day in the presence of Justin Tobia, Officer Miley, Edward Gore (an accountant with the New York County District Attorney's office) and Myron Ellis (petitioner's then defense attorney), petitioner, who had again been read his constitutional rights, admitted his participation in the check-stealing scheme. Petitioner, although urged by Alfaro to do so, never turned over to the authorities, to the Finance Administration, to Touche Ross, or to the banks any of the Krugerrands or any of the cash derived therefrom. [9] However, later that same evening of April 28, 1977, Alfaro's brother, Arthur Alfaro, showed up at the District Attorney's office with $ 20,000 in cash, apparently for bail money. Arthur Alfaro apparently had picked that money up from petitioner's wife, but he had no personal knowledge as to the source of the funds. [10]
*510 On September 30, 1977, a 61-count indictment was filed by the New York County District Attorney's office. Petitioner and Alfaro were charged with 14 counts of Grand Larceny in the Second Degree, 25 counts of forgery in the Second Degree, six counts of Grand Larceny in the Third Degree, four counts of Petit Larceny, five counts of Criminal Possession of a Forged Instrument in the Second Degree, two counts of Criminal Possession of Stolen Property in the First Degree, two counts of Criminal Possession of Stolen Property in the Second Degree, two counts of Criminal Posession of Stolen Property in the Third Degree, and one count of Criminal Impersonation. On February 17, 1978, Alfaro pleaded guilty to the first count of the indictment charging that Alfaro and petitioner stole 33 checks from New York City with a value in excess of $ 172,000, opened accounts in the name of Isaac Silverman, deposited the stolen checks therein, and then withdrew the funds to purchase gold coins. At the time Alfaro entered his guilty plea, he surrendered to the trial court $ 20,000 as restitution, restitution being one of the terms of his plea bargain. Approximately $ 1,000 of that amount was money Alfaro *511 received from the check-stealing scheme. The balance was $ 15,000 Alfaro had borrowed from his parents and some $ 4,000 he borrowed against his credit cards. Petitioner, however, did not plead guilty to any of the charges in the indictment. On February 28, 1979, after a two-week jury trial, petitioner was found guilty of 13 counts of Grand Larcey in the Second Degree, 21 counts of Forgery in the Second Degree, and seven counts of Grand Larceny in the Third Degree. Petitioner's conviction was affirmed by the Appellate Division of the First Department on February 7, 1980, and leave to appeal was denied without opinion on April 16, 1980, by the New York Court of Appeals. Petitioner later filed a motion for a writ of habeas corpus with two Federal District Courts which were denied. The United States Court of Appeals for the Second Circuit affirmed the District Courts. [11]
*512 On his joint 1977 Federal income tax return (Form 1040), petitioner did not report as income any of the proceeds obtained in the check-stealing scheme, failed to report as income the interest of $ 120.32 earned on the Isaac Silverman account at the Union Dime Savings Bank and claimed employee business expenses totaling $ 3,679. [12] By statutory notice of deficiency dated April 15, 1981, respondent determined that petitioner had unreported income of $ 102,894 from the checks he stole from the New York City Finance Administration and unreported interest income of $ 120.32 that was credited to the Isaac Silverman account at the Union Dime Savings Bank. Respondent increased his taxable income accordingly. Respondent also disallowed $ 1,395 of petitioner's claimed employee business expenses. Finally, respondent determined that all or part of the underpayment of tax was due to petitioner's fraud pursuant to section 6653(b). ULTIMATE FINDINGS OF FACT
*513 1. Petitioner had unreported income in 1977 from his check-stealing scheme in the amount of $ 90,815.58, resulting in an underpayment of his tax for that year. 2. Unreported interest income, if any, is included as a pro rata portion of the $ 90,815.58 determined above. 3. All or part of the underpayment of tax was due to fraud on the part of petitioner. OPINION Section 61(a) defines the term "gross income" to include "income from whatever source derived." Gross income includes illegal gains as well as legal gains. Sec. 1.61-14(a), Income Tax Regs.; James v. United States,366 U.S. 213, 219 (1961); Rutkin v. United States,343 U.S. 130, 137 (1952). Respondent determined that petitioner had unreported income from his check-stealing scheme. At trial, petitioner denied he stole any checks from the New York City Finance Administration or participated with Alfaro in depositing and converting any checks into either cash or gold coins. However, petitioner is collaterally estopped from denying participation in the check-stealing scheme. The rule of collateral estoppel and the policy underlying it were explained by the Supreme Court in Allen v. McCurry,449 U.S. 90, 94 (1980), *514 as follows: Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case. Montana v. United States,440 U.S. 147, 153. As this Court and other courts have often recognized, res judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication. Id., at 153-154. [Fn. ref omitted.]
It has long been established that estoppel in a civil case may be based on a judgment in a prior criminal case. Tomlinson v. Lefkowitz,334 F.2d 262, 264 (5th Cir. 1964), cert. denied 379 U.S. 962 (1965); Amos v. Commissioner,43 T.C. 50 (1964), affd. 360 F.2d 358 (4th Cir. 1965); Arctic Ice Cream Co. v. Commissioner,43 T.C. 68 (1964); cf. Monjar v. Commissioner, n31 T.C. 587, 614, 617 (1949). It is also well recognized that collateral estoppel based on the judgment of a state court *515 may be applied in a Federal court. Allen v. McCurry, supra at 95; Montana v. United States,440 U.S. 147 (1979). Furthermore, it is no bar to the application of collateral estoppel in the present case that respondent was not a party to petitioner's conviction in the New York court. [13] The Supreme Court has abolished the requirement of mutuality in applying collateral estoppel, requiring only that the party against whom the earlier decision is asserted must have had a "full and fair opportunity" to litigate that issue in the earlier case. Allen v. McCurry, supra at 94-95; Parklane Hosiery Co. v. Shore,439 U.S. 322, 331-333 (1979); Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,402 U.S. 313, 333-334, 350 (1971). See also Purvis v. Commissioner,T.C. Memo. 1983-376. *516 After a two-week jury trial, petitioner was found guilty, inter alia, of stealing checks during 1977 from the New York City Finance Administration, the same checks that were deposited into an account in the name of Isaac Silverman at the Union Dime Savings Bank during 1977. The record shows that petitioner had a full and fair opportunity to litigate in the New York courts (and also in the Federal courts) the question of his participation in the check-stealing scheme. See n. 11, supra. Accordingly, we hold that collateral estoppel applies to bar petitioner from denying he stole checks that were deposited in the Union Dime Savings Bank during 1977. However, wholly apart from collateral estoppel, the evidence offered at trial herein clearly and convincingly establishes that during 1977 petitioner stole 22 checks totaling $ 135,892.28 from the New York City Finance Administration, and together with Alfaro caused these checks to be deposited into a fictitious Isaac Silverman account at the Union Dime Savings Bank, and caused the proceeds in that account to be used to purchase Krugerrands. Alfaro testified that the checks he deposited into the fictitious Isaac Silverman account *517 at the Union Dime Savings Bank during 1977 he received from petitioner. The significant aspects of the check-stealing scheme as described by Alfaro at trial herein are consistent with his testimony at petitioner's criminal trial. Alfaro's testimony herein was also consistent with the testimony of Justin Tobia, the former Assistant District Attorney who participated in the early stages of petitioner's criminal case. Tobia testified that petitioner, on the date of his arrest, after having twice been read his constitutional rights, and in the presence of his attorney, admitted to Tobia his participation with Alfaro in the check-stealing scheme. [14]
*518 We must now determine the amount of unreported income petitioner realized from the check-stealing scheme. As set forth in our Findings of Fact, respondent determined that petitioner realized taxable income from the check-stealing scheme during 1977 in the amount of $ 102,894. Respondent computed this amount by subtracting the balance in the Isaac Silverman account at the Union Dime Savings Bank as of the date of Alfaro's arrest ($ 32,998) from the checks totaling $ 135,892 that were stolen and cashed or deposited in that account during 1977. [15] Respondent points out that his determination is presumed to be correct and petitioner has the burden of proving that such determination is erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Respondent argues that petitioner offered no evidence to dispute the correctness of the determination and it should be sustained. While we agree with respondent's statement of the law, we think the evidence shows that some adjustment is required. The record clearly establishes that Alfaro received part of the total proceeds from the check-stealing scheme and that part should not be taxable to petitioner. [16]
*519 Alfaro testified, and we have found as a fact, that he received approximately $ 15,000 from the check-stealing scheme during 1976 and 1977. Alfaro received $ 300 on the first withdrawal from the New York Bank for Savings in 1976. The record shows that Alfaro and petitioner always split the cash withdrawals fifty-fifty. Checks totaling $ 11,600 were stolen and deposited in two bank accounts during 1976, $ 10,200 into the New York Bank for Savings and $ 1,400 into the Union Dime Savings Bank. No withdrawals were made from the latter bank in 1976. See n. 5, supra. From the $ 10,200, the first withdrawal of $ 600 was split evenly between Alfaro and petitioner as noted above. A further amount of $ 7,258.68 was withdrawn by teller checks from that account in 1977 to purchase 47 Krugerrands. See n. 6, supra. That leaves a balance of at most $ 2,341.32 of which Alfaro could have received half in 1976. Thus, the most that Alfaro could have received in 1976 was $ 300 plus one-half of $ 2,341.32 ($ 1,170.66) or a total of $ 1,470.66. Therefore, we conclude that Alfaro received $ 1,400 in 1976 and $ 13,600 in 1977. [17]
*520 Thus, we conclude that petitioner had unreported income from the check-stealing scheme in 1977 in the amount of $ 90,815.58, computed as follows: Account balance at end of 1976
$ 1,401.00
Total deposits during 1977
133,492.28
Cash received at time of deposits
2,400.00
Plus interest credited during 1977
120.32
$ 137,413.60
Less balance at time of apprehension
32,998.02
[18] $ 104,415.58
Less amount received by Alfaro
in 1977
13,600.00
$ 90,815.58
The record clearly establishes that petitioner obtained possession of the 632 Krugerrands purchased with $ 98,055.58 of the 1977 stolen-check proceeds and 47 Krugerrands purchased in 1977 with $ 7,258.68 of the 1976 stolen-check proceeds. None of the Krugerrands nor any proceeds therefrom have ever been recovered, and petitioner has made no restitution of any of the stolen-check proceeds. [19] The record does not establish how many of the *521 Krugerrands were sold. However, petitioner had ample funds to give Alfaro $ 13,600 that year, and petitioner realized unreported taxable income of at least $ 90,815.58. As of March 31, 1977, interest in the amount of $ 120.32 was credited to the fictitious Isaac Silverman account at the Union Dime Savings Bank. Respondent determined that the entire amount was taxable to petitioner. Once again respondent argues that petitioner presented no evidence to dispute the determination and that we should sustain *522 the determination on petitioner's failure to meet his burden of proof. We think that normally part of this interest income would be taxable to Alfaro. In theory, an apportionment between petitioner and Alfaro should be made as to the unreported interest income determined by respondent. Here the interest was credited to the account just shortly before Alfaro and petitioner were arrested. The interest as such had not been withdrawn from the account and was part of the $ 32,998.02 balance seized at the time of their apprehension. If it is to be considered income to petitioner at all, it would be just a pro rata portion of the $ 90,815.58 unreported income determined above. Respondent disallowed $ 1,395 of petitioner's claimed employee business expenses. Petitioner failed to submit any receipts, canceled checks, or other documents or other evidence to substantiate his entitlement to the deduction claimed. Accordingly, we sustain respondent's determination on petitioner's failure to carry his burden of proof. Welch v. Helvering, supra; Rule 142(a).
Section 6653(b) fraud addition
Respondent determined that all or part of the underpayment of the tax for *523 the taxable year 1977 was due to petitioner's fraud. The fraud envisioned by section 6653(b) is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Candela v. United States,635 F.2d 1272 (7th Cir. 1980); Stolzfus v. United States,398 F.2d 1002, 1004 (3d Cir 1968), cert. denied 393 U.S. 1020 (1969); Mitchell v. Commissioner,118 F.2d 308 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), followed on remand 45 B.T.A. 822 (1941); Wilson v. Commissioner,76 T.C. 623, 634 (1981), Supplemental Opinion 77 T.C. 324 (1981). Respondent must show that the taxpayer intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent the collection of such taxes. Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 112-113 (1956). Fraud is a question of fact to be determined on the basis of the entire record. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), *524 affg. 37 T.C. 703 (1962), cert. denied 389 U.S. 912 (1967). Respondent has the burden of proving fraud and must establish each element of the fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). The elements to be shown are (1) an underpayment of tax, and (2) that some part of this underpayment was due to fraud. Hebrank v. Commissioner,81 T.C. 640, 642 (1983). Respondent has established by clear and convincing evidence an underpayment of tax for the taxable year 1977. We must now determine whether the underpayment of tax was due to petitioner's fraud. We harbor no reluctance to state at the outset that all or part of petitioner's underpayment of tax was due to fraud. Petitioner devised and participated in a scheme of stealing checks from the New York City Finance Administration and converting them into cash or gold coins. During 1977, petitioner received from the check-stealing scheme income in the amount of at least $ 90,815.58. Petitioner is a well-educated individual with considerable knowledge and experience in the tax area. Petitioner knew those proceeds constituted taxable income and should have been reported. *525 The entire check-stealing scheme was devised and carried out to conceal, mislead, and avoid detection. That conduct clearly evidences a fraudulent intent even though it may have also served another purpose such as concealment of other crimes. Spies v. United States,317 U.S. 492, 499 (1943). Petitioner filed his 1977 tax return with the intent of evading taxes he knew to be owing. We therefore sustain respondent's determination of the addition to tax for fraud under section 6653(b). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
2. His residence, where his wife and children lived, was at 323 Gill Lane, Iselin, New Jersey. At the time of trial, petitioner was incarcerated in the Middlesex County Jail in New Brunswick, New Jersey. ↩
3. Although petitioner filed a joint return with his wife for the taxable year 1977, respondent issued the statutory notice of deficiency for such year in petitioner/husband's name only. The adjustments involved only petitioner/husband's income and deductions. ↩
4. Petitioner has never been admitted to the bar and has never practiced law. ↩
5. On December 31, 1976, Alfaro deposited a check stolen by petitioner in the amount of $ 1,400 into the Union Dime Savings Bank account. The record indicates that this account was opened with an initial deposit of $ 1. ↩
6. On February 11, 1977, petitioner and Alfaro purchased 47 Krugerrands in the name of Isaac Silverman for the total purchase price of $ 7,258.68 (sales tax included). These coins were purchased with two teller checks drawn on the account of Isaac Silverman at the New York Bank for Savings using proceeds from checks stolen by petitioner and deposited into such account during 1976. ↩
7. One of these purchases was made with 1976 stolen-check proceeds withdrawn from the New York Bank for Savings during 1977. See n. 6, supra.↩
8. The coin dealer voided the order after Alfaro's arrest. ↩
9. After petitioner's defalcation, Touche Ross, his employer, made good to the New York City Finance Administration the amount of the unrecovered proceeds of the stolen checks. Thereafter, for the next couple of years, Touche Ross, the banks, and the police tried without success to obtain the Krugerrands or any remaining cash. While petitioner made tantalizing suggestions that he could and perhaps would turn over the remaining gold coins and cash, he has never done so. ↩
10. The record contains only double hearsay as to the source of these funds. There is insufficient evidence to make a finding that the $ 20,000 turned over to the authorities by Alfaro's brother or any part thereof represented proceeds from the check-stealing scheme. ↩
11. Thereafter petitioner apparently filed some further type of discretionary motion with the United States Court of Appeals for the Second Circuit which had not been acted on by the time of the trial. In any event, a writ of habeas corpus would appear to be moot at that point. At the time of trial, petitioner had just been convicted of a charge of conspiracy to engage in theft by deception and was just beginning to serve his sentence in the New Jersey prison system. ↩
12. Petitioner claimed employee business expenses of $ 2,113 in connection with his employment with Foodways National, Inc., and claimed employee business expenses of $ 1,566 in connection with his employment with Touche Ross & Co. ↩
13. The parties have presented this argument in terms of collateral estoppel. We would reach the same result under Commissioner v. Estate of Bosch,387 U.S. 456 (1967). See Mosteller v. Commissioner,T.C. Memo. 1986-505↩, on appeal (4th Cir., April 21, 1987). 14. Petitioner suggested that his confession was not voluntary because he was under the influence of codeine medication and alcohol, having allegedly spent that afternoon drinking at a bar with the arresting officer. The jury apparently did not believe petitioner's fanciful explanation, nor does this Court. To a limited extent Alfaro's testimony tended to corroborate some of the minor details of the afternoon's events but not the crucial aspects. On the whole, the Court found Alfaro to be a credible witness and found petitioner's testimony wholly unworthy of belief. ↩
15. We note that his account had a balance of $ 1,401 at the time the first deposit was made in 1977 representing at least one check stolen and deposited during 1976. Respondent did not take this into account in making his computations, and also rounded off the figures.↩
16. See McDowell v. Commissioner,T.C. Memo. 1987-186↩. 17. We think the reasonableness of this conclusion can be tested by viewing the totality of the check-stealing activity. Checks totaling $ 11,600 were stolen and deposited or cashed in 1976; checks totaling $ 135,892.28 were stolen and deposited or cashed during 1977. Since 7.9 percent of the total ($ 11,600 - $ 147,492.28) occurred in 1976, we think we could properly treat Alfaro as having received 7.9 percent of the $ 15,000, or $ 1,185 in 1976 and $ 13,815 in 1977. However, we use the figures of $ 1,400 and $ 13,600 as having a somewhat firmer factual foundation. ↩
18. Viewed another way, this $ 104,415.58 is composed of $ 2,400 cash received at time of deposits, plus $ 3,960 cash withdrawn from the Union Dime Savings Bank after deposit, plus $ 98,055.58 withdrawals by teller checks to purchase 632 Krugerrands.↩
19. Petitioner seems to suggest that he should receive credit for the $ 20,000 restitution made by Alfaro and the $ 20,000 seized from Alfaro's brother, Arthur Alfaro. The brother brought a package containing that sum to the police station after petitioner's arrest. The record does not establish that the $ 20,000 that Arthur Alfaro allegedly picked up from petitioner's wife was part of the proceeds of the check-stealing scheme. See n. 10, supra.↩ On the other hand, the record clearly establishes that the restitution made by Alfaro did not come from the stolen checks except perhaps for $ 1,000, the balance being a loan from his parents and money borrowed on his credit cards.